**UNITED STATES of America, Plaintiff,**

**v.**

**The CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

**San Francisco Firefighters Local 798, et al., Defendants, In Intervention.**

**Fontaine DAVIS, et al., Plaintiffs, In Intervention.**

**v.**

**CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

**San Francisco Firefighters Local 798, et al., Defendants, In Intervention.**

**Nos. C–84–7089 MHP, C–84–1100 MHP.**

United States District Court, N.D. California.

Sept. 25, 1990.

See also, 747 F.Supp. 1370.

Eva Jefferson Paterson, San Francisco Lawyers' Committee for Urban Affairs, Shauna I. Marshall, Equal Rights Advocates, William C. McNeill, III, Employment Law Center, Denise M. Hulett, Mexican–American Legal Defense & Educational Fund, San Francisco, Cal., Dennis W. Hayashi, Asian Law Caucus, Oakland, Cal., Mary C. Dunlap, Law Offices of Mary C. Dunlap, San Francisco, Cal., Russell Gallo-

way, Berkeley, Cal., Richard M. Pearl, Law Offices of Richard M. Pearl, San Francisco, Cal., for plaintiffs in intervention.

Robert T. Moore, Richard S. Ugelow, U.S. Dept. of Justice, Civ. Rights Div., Employment Litigation Section, Washington, D.C., Joann Swanson, Dept. of Justice, San Francisco, Cal., for Dept. of Justice.

Duane W. Reno, Cindy O'Hara–Varela, Davis, Reno & Courtney, San Francisco, Cal., for Firefighters Union, Local No. 798.

Louise K. Renne, City Atty., George Riley, Deputy City Atty., Judy Lynch, Deputy City Atty., San Francisco, Cal., for the City & County of San Francisco.

Barbara Y. Phillips, Rosen & Phillips, San Francisco, Cal., Special Monitor.

## OPINION

PATEL, District Judge.

These consolidated actions alleging constitutional and statutory violations arising from racial discrimination and harassment in employment practices were settled pursuant to a Consent Decree filed May 20, 1988. The matter is now before the court on plaintiff-intervenors' motion for an award of attorneys' fees under 42 U.S.C. § 2000e–5(k). Having considered the submissions of the parties, the court awards fees as set forth below.

BACKGROUND

These consolidated employment discrimination actions were brought by the United States and various individuals and organizations ("plaintiff-intervenors") against the City and County of San Francisco ("the City") in 1984 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 6701 et seq. (repealed 1986). Although this action was first initiated by the United States, private plaintiffs were allowed to intervene and carried the bulk of the work. The United States entered into an agreement disposing

of its interest in the litigation well before entry of the final consent decree.[1] The provisions of the government's agreement were mainly hortatory. The significant achievements on behalf of class members were accomplished by plaintiff-intervenors.

As consolidated, the claims in these actions focused on the City's use of invalid hiring and promotional procedures that had an adverse impact on women and minorities. Certain claims also alleged racial harassment of minority firefighters. All claims were settled as between the City and the plaintiff and plaintiff-intervenors pursuant to a consent decree filed May 20, 1988. *United States v. City and County of San Francisco*, 696 F.Supp. 1287, 1312 (N.D.Cal.1988) ("*Davis III*"), aff'd, 890 F.2d 1438 (9th Cir.1989), *petition for cert. filed* (Aug. 7, 1990) (No. 90–248). Although the decree settled all disputes on the merits, it did not resolve attorneys' fees. On December 2, 1988, counsel for plaintiff intervenors ("fee applicants") filed a motion seeking an award of attorney's fees against the City and against defendants-in-intervention, San Francisco Firefighters Union, Local No. 798 ("the Union" or "Local 798") under Title VII, section 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k).[2]

LEGAL STANDARD

The standards for attorneys' fee awards for prevailing Title VII plaintiffs are the same as those for fee awards under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983). Accordingly, absent special circumstances, prevailing Title VII plaintiffs should recover attorneys' fees. *Id.* at 429, 103 S.Ct. at 1937.

Ordinarily, plaintiffs will be considered to have prevailed when they have vindicated important rights or when they

---

[1]. The government's claims were completely resolved by virtue of the order granting permanent injunctive relief on February 26, 1987, over a year prior to entry of the final consent decree. *United States v. City and County of San Francisco*, 656 F.Supp. 276 (N.D.Cal.1987) ("*Davis I*"), aff'd, 890 F.2d 1438 (9th Cir.1989), *petition for cert. filed* (Aug. 7, 1990) (No. 90–248).

[2]. The statute provides in pertinent part: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 2000e–5(k).

succeed on any significant issue that achieves some of the benefit the parties sought in bringing suit. *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980); *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (citing *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir. 1978)).

If the court determines that plaintiffs have prevailed, it must calculate a reasonable attorneys' fee. The first step in this process is to arrive at a preliminary estimate of the value of the lawyer's services by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. To assist the court in arriving at this "lodestar" figure, the Ninth Circuit has adopted a twelve-factor formula which must be applied in each case.[3] *Kerr v. Screen Extras Guild,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). Supporting documentation with respect to the hours claimed and the rate requested must be provided to the court by plaintiffs. The documentation must be "sufficiently detailed that a neutral judge could make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed." *Jordan v. Multnomah County,* 815 F.2d 1258, 1263 (9th Cir.1987) (quoting *Hensley,* 461 U.S. at 441, 103 S.Ct. at 1943 (Burger, C.J., concurring)). There is a strong presumption that the resulting lodestar figure constitutes the reasonable fee, although it may be enhanced in rare cases. *Jordan,* 815 F.2d at 1262.

**3.** The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee in the community for similar work; (6) the fixed or contingent nature of the fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the cost; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr v. Screen Extras Guild,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

The district court need not consider all factors, but may focus its attention on those

## DISCUSSION

Both the City and the Union concede that plaintiff-intervenors are prevailing parties. The current dispute is whether the attorneys' fees requested are reasonable. The issues of both the hours expended and the rates requested have been thoroughly briefed and subjected to extensive discovery.[4] The court will take each in turn.

### I. *Hours Reasonably Expended*

■ In arriving at a figure for hours reasonably expended in litigation, the court employs the first of the twelve *Kerr* factors—the time and labor required. The fee applicants must prove by a preponderance of the evidence that the hours expended on the litigation were reasonable. They must submit detailed time records. *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210 (9th Cir.1986), *reh'g denied, opinion amended,* 808 F.2d 1373 (9th Cir.1987). The court may reduce the allowable hours on the grounds of inadequate documentation, overstaffing, duplicative hours, or excessive or otherwise unnecessary hours. *Id.* The City and, to a lesser extent, the Union challenge the reported hours on all of these bases.

### A. Inadequate Documentation

■ The City argues that plaintiff-intervenors' hours must be reduced due to overly vague descriptions of counsels' activities.[5] According to the City, time sheets only describing "co-counsel meeting," "client meeting" or "legal research" are

which are relevant. *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 838 (9th Cir.1982). Typically, the first factor is considered in determining the reasonable hours expended while other relevant factors come into play in determining of reasonable hourly rate. *Id.* at 840–41.

**4.** In fact, the volume of paper generated—several hundred pages of briefs, depositions, declarations and exhibits stands in striking contrast to Justice Powell's admonition that civil rights attorneys' fees requests "should not result in a second major litigation." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

**5.** Initially the City also objected to fees claimed for illegible hours. Those objections have been resolved after further discussions with the plaintiff-intervenors.

too general to aid the court in determining whether the hours chronicled were reasonably expended. The City compares these inadequacies to those found in *Daly v. Hill,* 790 F.2d 1071, 1079–80 (4th Cir.1986) (deducting virtually all hours described only as "conference with client"); *Grogg v. General Motors Corp.,* 612 F.Supp. 1375, 1382 (S.D.N.Y.1985) (50% reduction in total hours where records too vague to determine whether hours were reasonably expended); and *Kraszewski v. State Farm Insurance,* 36 F.E.P.Cas. 1371, 1378, 1984 WL 1027 (N.D.Cal.1984) (deducting hours described only as "conference with [name]").

In response, the plaintiff-intervenors argue that the court may properly refer to the relevant context of the litigation history and to summaries prepared from plaintiff's notes and files to resolve any vague time records. This court agrees.

"Basing the attorneys' fee award in part on reconstructed records developed by reference to litigation files and other records" is an established practice in this circuit. *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1473 (9th Cir. 1983), *aff'g* 525 F.Supp. 128 (N.D.Cal.1981). *Accord, Beta Sys., Inc. v. United States,* 866 F.2d 1404, 1406 (Fed.Cir.1989) (documentation held sufficiently detailed where supplemented by "typical billing records, showing time and charges, a description of the work done, and by whom"); *Berberena v. Coler,* 753 F.2d 629, 634 (7th Cir.1985) (otherwise vague entries on time sheets deemed permissible when viewed in the context of sufficiently detailed surrounding documentation); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1103 (2d Cir. 1977) (allowing reconstruction of undocumented time records by reference to pleading files, time records of other attorneys and other contemporaneous documents).

In response to court instructions, the City submitted a detailed summary of challenged records. Plaintiff-intervenors have submitted extensive reconstructed time records covering each of the challenged time entries. The reconstructed records were based upon (1) agendas and summaries of meetings; (2) notes and time records of co-counsel; and (3) the temporal and factual context of the challenged events.

The court has examined these records and determines that no reduction is necessary, particularly in light of plaintiff-intervenors' 5% reduction for billing judgment. The challenged hours were reasonably spent.

### B. Overstaffing

■ The City and the Union both assert that the plaintiff-intervenors' litigation team of seven attorneys constitutes gross overstaffing. The City argues that there were no real conflicts among the five subclasses of litigants, that no conflicting legal positions were ever asserted in briefs, that much of the Consent Decree does not differentiate between groups, that to the extent that the Consent Decree encompasses distinct goals for subclasses, those goals were reached either without dispute or based upon the City's initiative. According to the City, although the potential for conflict existed, it never appeared.

Plaintiff-intervenors counter that, in fact, conflicts among subclasses did exist, but that through coordination and meetings, which apparently were rancorous at times, Paterson Reply Decl. para. 10, various counsel were able to present a united front in the litigation. They argue that the fact that no conflicts surfaced in briefs or before the court is testament to their cooperative skills, skills for which they should not be penalized.

In fact, this court has already visited this issue in its Supplemental Fee Order of August 31, 1988. At that time, in response to the City's charge that too many attorneys were being used, the court stated:

> As often happens in complex litigation of this kind, the interests of all the subclasses are not precisely aligned on all issues. This requires that on every motion before the court, all counsel prepare and confer. The City should always be aware that when its actions spawn litigation it will be responsible for all reasonable attorneys' fees for all parties adversely affected by its actions.

Supplemental Order Awarding Attorneys' Fees at 9. Accordingly, no reduction in hours should be levied for time related to multiple class representation.

The City also argues that, even if one concedes the need to represent each subclass, only five attorneys were necessary. The City contends that Ms. Paterson and Mr. McNeill had needlessly overlapping responsibilities during the litigation, and that Mr. Galloway spent over 390 hours on general litigation activity when his supposed role was that of a testing expert. Additionally, the City and Local 798 argue that counsel for both subclasses of women, and counsel for Asians and for Hispanics went beyond representing the interests of their subclasses when they took part in general work including discovery, settlement activities and briefing. The City views all of these activities as indicative of unnecessary overstaffing in light of the expertise and experience of counsel.

The need for multiple counsel in complex class action litigation is well recognized. The Eleventh Circuit noted that "[t]he retaining of multiple attorneys in a significant, lengthy employment discrimination case ... [is] not a ground for reducing the hours claimed.... *[A] reduction is warranted only if the attorneys are unreasonably doing the same work.*" *Johnson v. University College of Univ. of Ala.*, 706 F.2d 1205, 1208 (11th Cir.) (emphasis added), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983). *Accord, Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 785 (9th Cir.), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

In reviewing the time records, the court is awarding fees for most of the claimed hours, since they "reflect [ ] the distinct contribution of each lawyer to the case." *Johnson*, 706 F.2d at 1208. However, the lodestar amount is reduced as follows due to certain multiple appearances by counsel and law students at depositions and hearings: Attorney Blanco—14 hours; Attorney Galloway—5.2 hours; Attorney McNeill—11 hours from his time with the firm of Pearl, McNeill & Gillespie; law student Edwards—6 hours.

### C. Duplicative Work

The City and the Union also maintain that much of the work billed in this case was duplicative. The City cites the following examples of duplication: (1) approximately 3500 hours spent either in co-counsel or client conferences; (2) 608 hours spent on file review; (3) excessive time spent drafting and researching. The City seeks a 50% reduction in the first two instances and "a substantial reduction" in the third.

If any of the enumerated charges are duplications they must be deducted. *Clark v. Marsh*, 609 F.Supp. 1028, 1034–35 (D.D.C.1985) (50% of client conference time deducted); *Jennings v. Lenox Hill Hosp.*, 42 F.E.P.Cas. 555, 558, 1986 WL 1177 (S.D.N.Y.1986) (reduction where use of multiple attorneys resulted in unnecessary time spent familiarizing each with case); *Farris v. Cox*, 508 F.Supp. 222, 226 (N.D.Cal.1981) (reduction of time where multiple attorneys attended depositions and hearings).

The plaintiff-intervenors lodge several replies. First, they point out that the presence of several attorneys at strategy sessions for complex civil rights class action cases may be crucial to the case. *Berberena*, 753 F.2d at 633; *McKenzie v. Kennickell*, 645 F.Supp. 437, 450 (D.D.C. 1986) (awarding attorneys' fees for co-counsel conferences); *Williamsburg Fair Hous. Comm. v. Ross–Rodney Hous. Corp.*, 599 F.Supp. 509, 518 (S.D.N.Y.1984) ("Multiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law."). Plaintiff-intervenors present evidence, in the form of agendas, meeting summaries and deposition testimony, of the efficient and essential nature of their co-counsel meetings. *See, e.g.*, Paterson Reply Decl. para. 11. Their evidence is comprehensive and persuasive. Plaintiff-intervenor counsel have met their burden of proving that attendance at co-counsel meetings was not duplicative.

Second, as to excessive file review, the plaintiff-intervenors assert that the defendants have mischaracterized documented work by labeling any work with the word

"review" in it as file review. The court's comparison of the attorney time records and the City's summaries supports that contention. In generating computer summaries, perhaps to facilitate data entry, the City forced attorney activities into narrow, at times unsuitable categories. Therefore, the conclusions which the City reached based on the faulty data are themselves faulty (once again illustrating the computer adage: garbage in, garbage out). No hours will be deducted for excessive file review.

Third, plaintiff-intervenors assert that the time spent drafting (and presumably researching) the pleadings in this case was reasonable. They insist that the 2,700 hours that the City alleges they spent on briefing seven motions, three state appellate briefs, and two trial briefs compares favorably to other cases where fees were awarded. *See, e.g., Thompson v. Barrett,* 599 F.Supp. 806, 811 (D.D.C.1984) (1,600 hours spent on one appeal). The court agrees. Moreover, a certain amount of drafting time is included in the 5% reduction for billing judgment.

### D. Non–Legal Work

The City and the Union contend that the plaintiff-intervenors seek compensation for activities that are not billable legal work. The challenged hours include time spent on travel, clerical matters, press conferences, Title VII presentations to organizations and incorporation of the Black Firefighters Association.

#### 1. *Travel Time.*

The City argues that much of the travel time in this case was spent by attorneys McNeill and Galloway essentially commuting to the office of co-counsel and is thus either compensable at a reduced rate, assuming work was done in transit, or not compensable at all.

Plaintiff-intervenors counter that the City has improperly characterized as "commuting" travel by the two attorneys from their respective offices to the office of co-counsel. Plaintiff-intervenors describe Mr. Galloway's residence as both his home and his office. Furthermore, according to plaintiff-intervenors, both men generally worked on the case while traveling to co-counsel meetings via public transit. Moreover, plaintiff-intervenors' counsel have submitted evidence establishing that local attorneys customarily bill their clients for travel time to co-counsel meetings. Schulz Depo. at 41:3–42:8; Barg Depo. at 16–23–18:11.

■ Reasonable attorneys' fees include reasonable travel time compensated at the full hourly rate. *Rose Confections, Inc. v. Ambrosia Chocolate Co.,* 816 F.2d 381, 396 (8th Cir.1987) (travel to and from depositions compensable) (citing *Craik v. Minnesota State Univ. Bd.,* 738 F.2d 348, 350 (8th Cir.1984) (travel to oral argument)); *Henry v. Webermeier,* 738 F.2d 188, 194 (7th Cir.1984) (traveling time in statutory fee cases compensable just as for fee-paying clients) [6]; *Danny Kresky Enter. v. Magid,* 716 F.2d 215, 217–18 (3rd Cir.1983). The court finds that the travel time claimed herein is reasonable.

#### 2. *Clerical Matters.*

The City contends that the plaintiff-intervenors' counsel spent some 83 hours on clerical chores such as xeroxing or serving and filing papers. Plaintiff-intervenors counter that the City's figure for total clerical hours is suspect, citing certain incorrect consolidations of clerical and non-clerical chores.

Courts have deducted time spent by attorneys in xeroxing, *Rajender v. Univ. of Minn.,* 546 F.Supp. 158, 165–166 (D.Minn. 1982), and time spent filing court papers, *Cook v. Block,* 609 F.Supp. 1036, 1042 (D.D.C.1985). But here, counsel spent less time involved in these or other clerical matters than the City contends. Once again, the City's computer summaries are in error. The court's comparison of those summaries versus the actual time records of the attorneys revealed inaccurate portrayals by the City in addition to those errors

---

**6.** *Webermeier* is controlling authority in the Seventh Circuit; thus the city's citation to *Communications Workers v. Illinois Bell Tele. Co.,* 553 F.Supp. 144, 148 (N.D.Ill.1982) (deduction of transportation expenses from fee awards deemed proper) is of no moment.

alleged by plaintiff-intervenors' counsel. For example, the City's summary lists 3.3 hours spent by Mr. McNeill on August 19, 1986 as "clerical." However, Mr. McNeill's time records for that day show that the hours the city must be referring to were spent finalizing an amicus brief (the only other hours billed that day being 1.65 in various phone conferences and .75 on a letter to the Special Master).

Moreover, the plaintiff-intervenors' counsel already deducted 5% of their hours in the exercise of billing judgment. That deduction will take care of any hours spent by attorneys xeroxing or filing papers with the court. In light of the deduction, and keeping in mind the suspect characterization of "clerical" hours by the City, no additional reduction is warranted.

### 3. Press Conferences.

The City and Local 798 also urge deletion of the time spent by counsel in press conferences and at a demonstration staged to foster political support among the City Board of Supervisors. Plaintiff-intervenors contend that such time is compensable because it furthered their goals of engendering necessary political support among the City's Board of Supervisors and of keeping class members apprised of the case.

Whether viewed as an effort to lobby the Board of Supervisors on behalf of their clients, or as a method of keeping class members apprised of events, press conference time may be compensable. Attorney work in the political arena, where narrowly focused on fostering the litigation goals of their clients, is compensable. *Jenkins v. Missouri*, 862 F.2d 677, 678 (8th Cir.1988) (time spent campaigning for passage of tax levy funding court-ordered desegregation plan held compensable), *aff'd*, —— U.S. ——, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Moreover, this court has previously found compensable the use of the media to publicize an action to class members. *Pollar v. Judson Steel Corp.*, 49 F.E.P.Cas. 224, 225, 1985 WL 312 (N.D.Cal.1985).

In this case, obtaining the support of the Board of Supervisors, whose members are elected by the citizens of the City and County of San Francisco, was as vital to the consent decree as were the negotiations with the City's administrative officials. Therefore, the time is compensable.

### 4. Presentations to Organizations.

The City maintains that Mr. McNeill has billed for some 20 hours spent giving talks to various community organizations. First, the court notes that Mr. McNeill's time records indicate that he did not bill for nine of the contested hours. McNeill Decl., Ex. A(1) at 58. Moreover, closer review of these hours, as well as similar hours by Ms. Marshall, shows that both attorneys spent the time conferring with their clients and with attorneys and firefighters involved in similar litigation. McNeill Reply Decl. para. 12; Marshall Depo. at 15:24–16:13. The contested activities were compensable legal work; the hours, save the nine deducted ones, will be included in the lodestar figure.

### 5. Incorporation of the Black Firefighters Association.

The City and the Union challenge the plaintiff-intervenor counsels' billing for 8.5 hours spent incorporating this organization. Plaintiff-intervenors concede that this time is not compensable and assert that it has already been deducted from their total hours. After a review of plaintiff-intervenor counsels' submissions, the court finds that in deed the disputed hours were deducted. McNeill Decl. para. 11(a).

### E. Unsuccessful Claims

The City and the Union urge the deduction of hours spent on the unsuccessful challenges to the Fire Department's drug testing program and to the dismissal of two female applicants from the Fire College. They also seek deduction of the hours spent on the allegedly unrelated work instituting state court writ proceedings to overturn Civil Service Commission decisions and representing individual Black firefighters at disciplinary proceedings.

The Supreme Court has held that no fee should be awarded in attorneys' fee cases for unsuccessful claims which are based on different facts and different legal theories than the successful claims. *Texas State Teachers Ass'n v. Garland Indep. School*

*Dist.*, 489 U.S. 782, ——, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989). However, plaintiff-intervenors' counsel argue that since they have achieved excellent results, they deserve a fully compensatory fee even though they did not prevail on every issue. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Furthermore, they maintain that their fee should include most of the contested hours because the claims are closely related to those on which plaintiff-intervenors prevailed. Keeping these legal principles and the arguments of counsel in mind, the court addresses each claim in turn.

### 1. *Challenge to Drug Testing Program.*

■ The City argues that plaintiff-intervenors' challenge to the Fire Department's substance abuse screening program was unrelated to the race and sex discrimination claims which were central to this case. The fee applicants counter that they challenged the drug testing program because they believed it would be used pretextually to discriminate against women and minority job applicants. However, a review of this court's August 27, 1987 order denying plaintiff-intervenors' motion for a preliminary injunction demonstrates that they objected to the proposed testing solely on fourth amendment and analogous state law grounds. Consequently, the fee applicants cannot receive compensation for time spent presenting those constitutional objections.

Nevertheless, some of the time spent litigating the substance abuse screening program is compensable. Prior to the issuance of a temporary restraining order on July 24, 1987, the City intended to move forward with its drug screening program despite this court's February 1986 order placing any such program under the supervision of the court and the monitor. *United States v. City and County of San Francisco*, 656 F.Supp. 276, 292–93 (N.D. Cal.1987) (*"Davis I"*) (monitor to supervise interim hiring; City to submit proposal regarding conduct of medical investigations), *aff'd as modified*, 890 F.2d 1438 (9th Cir. 1989), *petition for cert. filed* (August 7, 1990) (No. 90–248). Consequently, plaintiff-intervenors were forced to expend re-

sources in order to seek a stay and in order to litigate the threshold issue of this court's jurisdiction over the dispute. Since they prevailed in both instances, the fee applicants are entitled to a compensatory award. One third of the total hours spent on challenging the substance abuse screening program are thus compensable. Accordingly, two-thirds of the hours challenged by the City shall be deducted as follows: Ms. Hulett—13.5 hours; Mr. Lee —1 hour; Ms. Paterson—5 hours; Mr. McNeill—24 hours from his time with the Culver Law Firm; Ms. Marshall—11 hours.[7]

### 2. *Challenged Dismissal of Female Trainees.*

■ The City also argues that the unsuccessful attempt to reverse the dismissal of two women from the Fire College was unrelated to the prevailing claims. The court disagrees. Counsels' work to reverse those dismissals was part of the larger goal of increasing the hiring and retention rates for all female applicants, on which they prevailed. Furthermore, no one has contested plaintiff-intervenors' counsel's assertion that the City has since adopted the very standards (regarding the length and focus of training for female applicants) which were sought for the two dismissed women. Marshall Reply Decl. para. 15. Compensation is merited for the contested hours.

### 3. *State Writ Proceedings and Disciplinary Proceedings.*

■ According to the City and the Union, Mr. McNeill's representation of individual black firefighters in state court writ proceedings and in disciplinary hearings is unrelated to the prevailing claim in this case.

The writ proceedings were brought to block publication of promotion lists which were compiled based on allegedly invalid tests. However, the theories pursued in the writ proceedings were not based on race discrimination; instead counsel argued

7. In response to the Union's contention that only one attorney should be compensated for attendance at the hearing on the matter, counsel for plaintiff-intervenors have already partially reduced their fee request and the deductions set forth herein have taken this into account.

that a lack of notice of grading procedures was a denial of due process and that grading distinctions made between those who answered one or two questions and those who answered none violated equal protection guarantees. McNeill Depo. at 116:12–20. Those arguments would apply to test-takers regardless of race or gender and victory would have done nothing to advance the interests of the plaintiff class. The claims at issue (Mr. Braden's and Mr. Demmons') are unrelated to the core facts of this case.

With regard to the disciplinary hearings, plaintiff-intervenors contend that the representation was related to the racial harassment charges in the primary litigation.[8] However, neither Mr. McNeill's deposition testimony nor his time sheets establish any link to work on racial harassment claims. McNeill Depo. at 126–29. Attorney McNeill's testimony tends to indicate that the representation before the Fire Commission was related to disciplinary action due to a firefighter's drug usage. No evidence is before the court on the relationship between disciplining a drug abuser and racial harassment. Counsel has not argued, for example, that similarly situated white firefighters went undisciplined. Time spent on the disciplinary matter shall be deducted.

The cases cited by counsel for plaintiff-intervenors to support a contrary result are distinguishable. In each case, the contested hours were spent representing the interests of the entire class in matters closely related to the core issues in the primary litigation. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("Delaware Valley I") (appearances before state and federal agencies and state court on behalf of all class members were compensable as post-judgment monitoring of consent decree); *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 766 (7th Cir.1982) (time spent on debarment proceedings

which involved issues identical to, and which led to settlement of, the Title VII proceedings held compensable), *cert. denied*, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Lampher v. Zagel*, 755 F.2d 99, 103–04 (7th Cir.1985) (hours compensable where spent representing identical parties in state court proceeding with identical issues).

The hours spent on the state court writ proceedings and the disciplinary hearings are properly deductible. Plaintiff-intervenors did not contest the City's assertion that over 100 hours were spent on these issues. Accordingly, 120 hours are deducted from Attorney McNeill's compensable hours as follows: one hundred hours are deducted from his billings with the law firm of Pearl, McNeill & Gillespie for the state writ proceeding; 10 hours are deducted from his billings as a sole practitioner; and 10 hours are deducted from his billings with the Culver Law Firm.

**F. Law Student Hours**

The City and the Union argue that much of the law student time in this case is not compensable. The City argues that the law students engaged in unrelated work on the drug testing issue and on jury selection, conducted possibly redundant research, spent excessive time drafting interrogatories, and spent time engaged in clerical chores.[9]

First, with respect to work on drug testing, two-thirds of the challenged hours are not compensable, as discussed in subsection E, above. Therefore, 36.7 hours shall be deducted from the lodestar amount for law student Michael Adams.

Second, with respect to work related to jury selection, all challenged hours are allowable. The work was especially relevant to this case given the fact that the City did not concede the key issues until the very

---

8. Actually, although both sides speak of representation of "firefighters," the record only establishes representation of one firefighter in a disciplinary hearing, Robert McGriff. McNeill Depo. at 126:11–128:5.

9. The City also argued that the law students provided overly vague documentation and attended meetings or proceedings that were already over-attended. The court resolved both of these contentions, allowing the challenged hours for attorneys as well as for law students. *See* the discussion above in Sections B and C.

eve of trial after substantial preparation for trial had commenced.

Third, with respect to redundant research, the City contends that no showing has been made that 9.5 hours spent in research by Em Herzstein, a law clerk for Ms. Dunlap, were not reasonably expended. A review of Ms. Herzstein's time records reveals that the contested hours were spent not merely on research, but also on writing and discussing two memoranda on distinct issues in the litigation. The hours were reasonably spent.

Fourth, with respect to the drafting of interrogatories, the court finds the hours were reasonably expended. While an attorney may well have been able to accomplish the task more expeditiously, it is not beyond reason to assign the task to a law clerk who will bill at a lower rate for the time spent.

Finally, with respect to the clerical work assertedly performed by Ms. Edwards, a law clerk for Ms. Paterson, the court has examined closely her time records. Thirteen hours spent xeroxing are hereby deducted as not properly compensable paralegal time.

## II. *Reasonable Hourly Rate*

The reasonable hourly rate is determined by reference to the prevailing rate in the community for similar work by attorneys of like skill, reputation and experience. *Jordan*, 815 F.2d at 1262–63. The prevailing party must present evidence on the issue beyond affidavits of counsel. *Id.* at 1263. The court has taken into account rate evidence provided by plaintiff-intervenors, the City and the Union. That evidence will be assessed below in light of the *Kerr* factors. While the factors "[are] not intended to be exhaustive or exclusive," *Chalmers*, 796 F.2d at 1215 n. 5, the court finds most of them relevant in this case.

### A. The Relevant Kerr Factors

1. *Novelty and Difficulty of Questions.*

Federal courts have recognized that Title VII cases are becoming increasingly difficult to litigate. Judge Orrick of this district observed that private sector Title VII cases are much more difficult now than in the early days when blanket exclusions of women, regardless of ability, and obviously racially-biased tests were more commonplace. *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 612 (N.D.Cal.1979); *accord, Fadhl v. City and County of San Francisco*, 38 Empl.Prac.Dec. (CCH) ¶ 35,677 at 40,029, 1985 WL 349 (N.D.Cal. July 10, 1985) (noting general difficulties involved in litigating a Title VII case). Furthermore, the Fifth Circuit has noted, "If there ever was a time of facile Title VII litigation, it surely ended with the demise of intentional violations of equal employment opportunity. Today's parade of Title VII cases present more and more subtle manifestations of discrimination." *Swint v. Pullman–Standard*, 539 F.2d 77, 99 (5th Cir.1976).

In this case plaintiff-intervenors faced the particular difficulty of proving, among other things, the adverse impact of facially objective entrance and promotional examinations. To make their case, plaintiff-intervenors had to marshall considerable testing expertise. Moreover, the city compounded the difficulties in the case through two years of "tenacious and uncompromising pretrial litigation in defense of the challenged examinations[.]" *Davis I*, 656 F.Supp. at 281.

2. *The Skill Requisite to Perform the Legal Services Properly.*

To properly litigate a class action suit, counsel must be able to defeat potential challenges to their competency as adequate class counsel. Counsel must display expertise in either class litigation in general or in the subject matter of the dispute since those factors can be determinative in adequacy disputes. *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 129 (3rd Cir.1987) (adequacy of counsel likely met if experienced co-counsel were acquired), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988); *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 485–86 (E.D.Pa.1977) (familiarity with subject matter of suit overcame lack of experience and met adequacy requirement).

Representing the interests of class members during the remedial phase of this liti-

gation also requires skilled counsel. Counsel must be alert throughout the period of the decree to the possibility of actions detrimental to their clients' interests. For example, it was through the efforts of counsel for plaintiff-intervenors that this court was alerted to the City's planned budget cuts which would have adversely affected the decree. As at other junctures in the litigation, counsel for plaintiff-intervenors exhibited critical legal and political skill in opposing the budget cuts.

Class counsel have submitted affidavits amply demonstrating their experience and proficiency with employment discrimination class actions in the private and public sectors. Marshall Decl. at 2:23–3:16 (expertise in cases involving employment discrimination against women); McNeill Decl. at 2:9–3:3 (general employment discrimination expertise); Paterson Decl. at 2:2–4:1 (civil rights class action expertise).

### 3. *The Preclusion of Other Work.*

Counsel for plaintiff-intervenors all practice law in firms with ongoing practices. Most of them depend on public funding and thus have budgets which significantly limit the number of cases they can take. To the extent that they were involved in this case, and their affidavits indicate the massive level of commitment, they have been unable to carry other cases. In fact, Mr. McNeill's involvement so limited his ability to do other work that it apparently contributed to the demise of a partnership in which he was a member. McNeill Decl. at 4:21–5:6.

Moreover, the remedial phase of this suit will continue to require a significant resource commitment. Resolution of the racial harassment claims has proven to be a lengthy process. Counsel must also allot time for monitoring the progress of goals set out by the decree.

In sum, the massive pre-trial discovery and negotiations and the extensive commitment required during the remedial phase support the finding that these attorneys were precluded from most other work during litigation of this case.

### 4. *The Fixed or Contingent Nature of the Fee.*

The focus of analysis under this factor is whether or not other compensation, in addition to a potential fee award, is available to fee applicants. Aside from Mr. McNeill, the applicants have no fee arrangements with their clients. Most of the applicants are salaried public interest attorneys who do not charge their clients. Their salaries depend upon their organizations' abilities to obtain funding sources, including court ordered fee awards. Mr. McNeill's fee arrangement yielded only a small amount of compensation. Before joining the public interest group in which he now practices, Mr. McNeill had a loosely defined fee agreement with the Black Firefighters Association whereby they were to pay him whatever they could. McNeill Depo. at 34:25–35:19. As a result he received $20,-365.56 in fees through his various law firms.

Ms. Dunlap and Mr. Galloway are the only attorneys for plaintiff-intervenors (except for the fees counsel) who are not employed by public interest firms. They will receive no compensation for time spent on this case other than from the fee award.

### 5. *Time Limitations Imposed by the Client or the Circumstances.*

The applicants were subjected to the normal time limitations of a case which is expected to go to trial. They had to prepare their work product within the confines of the pre-trial schedule. Perhaps the most dramatic time limitation occurred in October 1986. Settlement negotiations between the City and the plaintiff-intervenors broke down. The City indicated its tentative approval of a consent decree proposed by the Department of Justice and moved to have it adopted by the Board of Supervisors. Since they believed that the Department of Justice's consent decree would severely restrict the remedies available to their clients, counsel for the plaintiff-intervenors had to quickly assess the situation and mount a political campaign to stop the proposed decree. Their ability to respond creatively under time pressure is a positive factor in their fee award.

### 6. The Amount Involved and the Results Obtained.

The applicants have obtained excellent results as demonstrated by the entry of four separate orders enjoining actions by the City and approving the consent decree. As this court noted in its order approving the consent decree:

"The plan is comprehensive in that it creates a whole system that deals with issues including test development, recruitment, the timing of the administration of tests and the duration of promotional lists, grievance procedures for complaints regarding both testing procedures and racial harassment, human relations training, issuance of appropriate equipment to all firefighters and provision for a court-appointed monitor who will supervise the implementation of the decree."

Davis III, 696 F.Supp. at 1307.

Although earlier consent decrees between the San Francisco Fire Department and minorities existed, this is the first time that the City has truly moved forward. Until recent changes in the attitude of City officials occurred, the Department was recalcitrant in its resistance to change. The few minorities in the Department were confronted with racial hostility on a day-to-day basis. While the change in political administrations motivated the City's ultimate cooperation, the months of prior litigation could not have come to a successful conclusion without the tenacity of plaintiff-intervenors' counsel. Besides, even given the City's comparative cooperation late in the process, applicants still had to contend with the vigorous opposition of the Union. The applicants obtained excellent results.

Broad systemic relief such as that obtained here is not easily measured in terms of "the amount involved," which suggests a monetary figure. Nevertheless this court can quantify certain extraordinary results. In 1985, minorities comprised only 14.6% of the city's firefighting force. As of August 8, 1990 minority composition stood at 24%. In a department which hired no women before 1985 there are now 36, comprising 2.6% of the force. One of the women is a lieutenant. Minority men have registered even broader gains in the officer ranks. In a fire department that had no minority members in the ranks of lieutenant or above in 1985, there are presently 54 lieutenants, eight captains, five battalion chiefs, one assistant chief and one assistant deputy chief II.[10] Yet the greatest value, in terms of increased respect for local government and heightened pride in the affected communities, is immeasurable.

### 7. The Experience, Reputation and Ability of the Attorneys.

Each of the attorneys for plaintiff-intervenors submitted resumes detailing their ability to competently handle this case. Those submissions demonstrate the high level of experience, ability and reputation enjoyed by the fee applicants.

#### a. Mary Dunlap

Ms. Dunlap, co-counsel representing one of the subclasses of women, received her J.D. from the University of California, Berkeley, Boalt Hall in 1971, and has been a member of the California Bar since 1972. She is a co-founder of Equal Rights Advocates ("ERA"), a public interest law firm dedicated to ending discrimination against women. Over the course of her career she has litigated forty-three individual and 10 class action employment discrimination cases. Ms. Dunlap has written and lectured widely on sex-based discrimination, and lectures frequently at area law schools.

#### b. Russell Galloway

Mr. Galloway, co-counsel specializing in test validity issues, graduated magna cum laude from Columbia University School of Law in 1965 and was admitted to the California Bar in 1969. He spent seven years as a staff attorney for the Legal Aid Socie-

---

**10.** Statistics in the text were submitted to the court by the Consent Decree Monitor in a document labeled "San Francisco Fire Department Uniformed Force—Rank by Race and Sex." The figures indicate that, as of August 5, 1990, the race and gender composition of the fire department was as follows: 1,041 White males (75.7%), 20 White females (1.5%), 103 Black males (7.5%), 10 Black females (.7%), 117 Hispanic males (8.5%), 4 Hispanic females (.3%), 55 Asian males (4%), 2 Asian females (.1%), 21 Filipino males (1.5%), 3 American Indians/Other males (.2%).

ty of Alameda County, working primarily in employment discrimination and affirmative action litigation. A partial list of his litigation experience covers 19 federal cases including trial and appellate work, primarily regarding employment discrimination against classes and individuals. Mr. Galloway is now a tenured professor of law at the University of Santa Clara. He continues to work on Title VII cases and has published dozens of articles on employment discrimination and other legal areas in law reviews and other periodicals. He was recruited as part of the litigation team because of his extensive Title VII experience and his particular expertise in testing issues.

#### c. Denise Hulett

Ms. Hulett, a staff attorney at the Mexican American Legal Defense and Education Fund ("MALDEF"), is counsel for the Hispanic class members. She graduated from King Hall School of Law, University of California, Davis in 1985 and was admitted that year to the California Bar. She began her practice with the firm of Rosen & Phillips, where she participated in a successful prisoner constitutional rights class action case. As a MALDEF attorney, Ms. Hulett is currently litigating four employment discrimination class action suits in addition to the instant case.

#### d. Edwin Lee

Mr. Lee, co-counsel representing Asians in the case, received his law degree from Boalt Hall School of Law, University of California, Berkeley in 1978 and was admitted to the bar in 1979. During work on this litigation, he was managing attorney of the San Francisco office of the Asian Law Caucus, a public interest law firm engaged in protecting the legal rights of Asians. Mr. Lee's work for the Caucus focused primarily on cases of discrimination in housing and employment. Notable cases and issues in which Mr. Lee has been active include work on the San Francisco Minority and Business Enterprise Ordinance and the Chinatown Residential Hotel Demolition Moratorium.

#### e. William McNeill

Mr. McNeill served as lead counsel for the plaintiff-intervenors' team for half of the substantive litigation period. He also represented the Black Firefighters Association throughout the proceedings. Mr. McNeill graduated from the University of Michigan in 1971. He is a member of the Bars of Massachusetts, Georgia and California. He has specialized in employment discrimination since 1973 when he became a staff attorney at the Equal Employment Opportunity Commission Regional Litigation Center in Atlanta, Georgia. He was Director of the Title VII Project in San Francisco for the Lawyers' Committee for Civil Rights Under the Law from 1974 to 1976. In 1976 Mr. McNeill became a Regional Counsel for California Rural Legal Assistance, a position in which he remained until going into private practice in 1982. In private practice he continued to litigate employment discrimination cases. Presently, he is a staff attorney for the Employment Law Center, a public interest law firm in San Francisco.

#### f. Shauna Marshall

Shauna Marshall, a staff attorney at Equal Rights Advocates, represented the interests of a subclass of women in this litigation. She graduated from the University of California, Davis in 1979 and was admitted to the California Bar that same year. Until 1984 she was a trial attorney in the United States Justice Department Honors Program, working in the San Francisco Field Office of the Anti-trust Division. Since 1984 she has been a staff attorney at ERA, working primarily on women's employment rights. Her successful cases have included remedying wage and hour violations in the garment industry and obtaining a large settlement in a police department sexual harassment case. She is currently on the Child Care Law Center's Board of Directors and was formerly on the board of Berkeley Neighborhood Legal Services.

#### g. Eva Jefferson Paterson

Ms. Paterson served as lead counsel for plaintiff-intervenors' litigation team for half of this case's history. She also represented the Black Firefighters Association on behalf of the San Francisco Lawyers' Committee for Urban Affairs ("Lawyers'

Committee"), of which she is now Executive Director. Ms. Paterson received her law degree from Boalt Hall School of Law, University of California, Berkeley in 1975 and was admitted to the Bars of California and the Federal Court for the Northern District of California in that year. She is also admitted to practice before the Ninth Circuit Court of Appeals and the United States Supreme Court.

Ms. Paterson's legal career has focused exclusively on civil rights law. She practiced as a staff attorney with the Legal Aid Society of Alameda County from 1975 to 1977. From 1977 until her recent selection as Executive Director, she was the Assistant Director at the Lawyers' Committee. She has also lectured on civil rights and litigation strategy as an adjunct professor of law at Hastings College of the Law, University of California, from 1980–1983. Her litigation experience includes numerous successful Title VII suits. The community and professional awards received by Ms. Paterson include the Black Leadership Forum's 1988 Woman of the Year Award, the National ACLU Certificate of Appreciation, and the NAACP Legal Defense and Education Fund 1988 Legal Award.

### 8. *The Nature and Length of the Relationship.*

This factor was explained in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 719 (5th Cir.1974), abrogated by *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), as follows: "A lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." In this action the factor is inapplicable. The very nature of this type of case tends to indicate that an ongoing professional relationship is unlikely. Most counsel are employed by public interest firms. The few who are in private practice, or were at the time of performing work on this case, do not have a professional relationship with any of the plaintiffs or class members apart from this case. Therefore, this factor is not included in calculating the lodestar.

### 9. *The Customary Fee in the Community for Similar Work and Awards in Similar Cases.*

To aid the court in ascertaining the customary fee and awards in similar cases, counsel for both the City and plaintiff-intervenors have submitted declarations, deposition testimony and case law. Plaintiff-intervenors particularly refer the court to its Supplemental Fee Order of August 31, 1988 and the declarations filed in conjunction with it. In the Supplemental Order this court found that counsels' requested rates were "well within the rates prevailing in the Bay Area for attorneys of like skill, experience and reputation working on litigation of similar subject and complexity." Supp. Order Awarding Attorneys' Fees at 10. That finding was based primarily on declarations by Guy Saperstein, Jack London and James Hunt. The applicants have now re-submitted those declarations, by reference, and supplemented them with declarations from similar cases.

The combined weight of their evidence establishes that the applicants' rates are, as in their earlier application, well within the range of rates charged in the San Francisco Bay area for similar work. The 1988 billing rates they seek are from $110 per hour for 1985 graduates to $235 per hour for 1969 graduates. For paralegals they seek $70 per hour. By comparison, Mr. Saperstein, a prominent Title VII class action attorney, declared that attorneys at his firm with experience comparable to applicants would bill at 1988 hourly rates ranging from $110 for 1986 law school graduates to $250 for 1969 graduates. Paralegals at his firm would bill at $50 to $85 per hour. Saperstein Decl. at 4:18–5:2. Mr. Hunt asserts that attorneys at his firm with experience comparable to that of applicants would bill at 1988 hourly rates ranging from $150 for 1985 graduates to $230 for 1971 graduates. Hunt Decl. at 2:17–21. Mr. Steven Mayer, in a declaration filed in a sex discrimination case in this district, stated that attorneys at his firm with experience comparable to applicants would bill at 1988 hourly rates ranging from $155 for 1984 graduates to $195–$205 for 1980 graduates. Law clerks' 1988

hourly rates were $75. Mayer Decl. at 2:17–19.

The case law provides further support for the conclusion that the applicants' requested rates are within community norms. Aside from this court's Supplemental Fee Order, other cases include: *San Francisco Police Officers' Association v. City and County of San Francisco*, No. 85–2180 (9th Cir. Sept. 6, 1989) (attorneys' fees ranging from $140 to $190 per hour); *Herrington v. County of Sonoma*, 883 F.2d 739, 746 (9th Cir.1989) ($200 per hour for senior partner; $150 per hour for senior associate; $80 per hour for junior associate, and $45–$50 per hour for paralegals); *Cabrales v. County of Los Angeles*, 875 F.2d 740 (9th Cir.1989) (rates of $175–$225 per hour). *But see Bernardi v. Yeutter*, C 73–1110 SC (N.D.Cal. Jan. 5, 1990) (rates of $105–$145 per hour; $50 per hour for law clerks).

### B. The City's Contentions Regarding a Reduced Rate

The City advances several arguments against an award of fees at the requested rates. First, it argues that the rates are premium rates, rather than prevailing rates. Second, it argues that the rates are excessive because four attorneys seek rates normally charged only by lead counsel. Third, it argues that the rates are beyond those normally charged for many of the tasks in the litigation. Fourth, it argues that the rates are in excess of the fee applicants' own normal hourly rates. Fifth, it argues that the fee applicants have not established any right to compensation for law student time. The court will address each of these issues in turn.

#### 1. *Whether Premium Rates are Being Charged.*

The City first argues that the rates sought by the applicants here are premium rates, charged only by a handful of firms in the area. It contends that the average 1988 rates for attorneys with experience similar to that of Dunlap, Galloway, McNeill and Paterson are from $130 to $134 per hour, with only ten percent billing above $175 per hour. The average rates for attorneys with experience similar to Marshall, Lee and Hulett are assertedly even lower. However, the support for the City's argument is deficient. The apparent centerpiece of their attack, a survey by the legal consulting firm of Altman & Weil, is not representative of rates charged for complex litigation in the San Francisco area. Data was gathered nationwide and covered a broad number of practice areas, including insurance defense, which Mr. Weil admits has significantly lower billing rates than other areas. Weil Depo. at 10–12. In fact, Mr. Weil admits that the rates for complex federal litigation would be as much as $50 per hour higher than the survey's reported averages. Weil Depo. at 12.

The City further argues that the rate of Mr. Baller, a federal employment discrimination litigator and one of the applicants' declarants, should be virtually conclusive on the question of an hourly rate due to his eminent credentials and experience. However, Mr. Baller's rate is simply some evidence of the range of rates in the area.

The City also mistakenly contends that public interest attorneys are not entitled to value their rates at the same level as corporate attorneys of equal caliber. *EEOC v. Sage Realty Corp.*, 521 F.Supp. 263, 270 (S.D.N.Y.1981). However, *Sage Realty* is flatly contrary to Supreme Court precedent. The Court's has made it clear that "the calculation of fee awards [may not] vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." *Blum v. Stenson*, 465 U.S. 886, 894, 104 S.Ct. 1541, 1546, 79 L.Ed.2d 891 (1984). Moreover, this court recognizes that fees for public interest legal work are set entirely by courts; no client is ever charged. For the court to be the instrument of bias against such laudable endeavors would be unconscionable. The court accords equal value to complex litigation of all types.

#### 2. *Whether Four Attorneys Seek Lead Counsel Rates.*

The City asserts that attorneys Dunlap, Galloway, McNeill and Paterson are all billing at rates which are normally only charged for time spent overseeing or leading a litigation team. Since only Galloway

and Paterson acted as lead counsel, and each of them only half of the time, the City posits that the four counsels' rates should be reduced accordingly. The court does not share the City's view. Whether counsel is serving as lead counsel or not, a uniform rate is awardable. The City cites no case law to the contrary, and its vague reference to supporting declarations is offset by the deposition testimony of its own declarants. Barg Depo. at 15:15–16:15; Schulz Depo. at 38:4–39:5.

### 3. Whether Rates are Excessive for Certain Tasks.

The City further maintains that, even if the applicants deserve their requested hourly rates in some instances, they should not be compensated at those rates for certain tasks that required less expertise. Instead, the City argues that court-awarded compensation should promote the use of the commercial law firm-type pyramidal staffing pattern, whereby most work is performed by junior attorneys or senior associates. *See, e.g.,* Schulz Decl. at 3, 6.

While the City's argument and the case law cited from other circuits have some force,[11] in this circuit there is ample authority for awarding a single fee for all work done. *See, e.g., Suzuki v. Yuen,* 678 F.2d 761, 764 (9th Cir.1982) (one rate for research, discussion, drafting, proofreading and court appearances by counsel); *Handgards, Inc. v. Ethicon, Inc.,* 552 F.Supp. 820, 823 (N.D.Cal.1982) (applying one rate to all tasks without delineating types of tasks performed), *aff'd,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985); *Powell v. United States Dept. of Justice,* 569 F.Supp. 1192, 1203 (N.D.Cal.1983) (flat rate for all tasks including review and organization of documents).

In any event, as the fee applicants' declarations and citations demonstrate, the efficacy of the pyramidal staffing pattern is a matter of some debate. Beasley Decl. paras. 6–8; Moore Decl. para. 4; *Muehler v. Land O'Lakes, Inc.,* 617 F.Supp. 1370, 1379 (D.Minn.1985) (questioning wisdom of judicial involvement in staffing issues and not-

ing efficiency of senior partners engaging in research); *Laffey v. Northwest Airlines,* 572 F.Supp. 354, 366 (D.D.C.1983) (noting efficiency of senior attorneys engaging in research, drafting, etc.), *rev'd on other grounds,* 746 F.2d 4 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). The court declines to award fees by task type and instead will grant a uniform rate for each attorney.

### 4. Whether Rates are Beyond Counsels' Normal Fees.

The City urges that this court limit awardable fees to the rates which the fee applicants normally bill for their work. The City claims that the pertinent rule in this circuit is substantially similar to that espoused in *Laffey v. Northwest Airlines,* 746 F.2d 4, 24–25 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). The *Laffey* court ruled that the historical rate of fee applicants is the proper figure for an award, so long as it is within the range of rates within the relevant legal community. However, the rule in this circuit is markedly different:

> This Circuit does not follow the legal standard set forth in *Laffey.* "While evidence of counsel's customary hourly rate may be considered by the District Court, it is not a [sic] abuse of discretion in this type of case to use the reasonable community standard that was employed here."

*Maldonado v. Lehman,* 811 F.2d 1341, 1342 (9th Cir.) (quoting *White v. City of Richmond,* 713 F.2d 458 (9th Cir.1983)), *cert. denied,* 484 U.S. 990, 108 S.Ct. 480, 98 L.Ed.2d 509 (1987). Furthermore, the D.C. Circuit has expressly overruled *Laffey,* holding that the prevailing market rates must be used to determine fees under the fee-shifting statutes. *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1524 (D.C.Cir.1988).

### 5. Whether Law Student Time is Compensable.

Finally, the City asserts that the applicants have not established the right to com-

---

**11.** *See, e.g., Cohen v. West Haven Bd. of Police Comm'rs,* 638 F.2d 496, 505 (2d Cir.1980) ("a

different rate of compensation may well be set for different types of litigation tasks").

pensation for law student time. That contention ignores the court's Supplemental Fee Order which included an award for such time and wherein this court encouraged use of law students to reduce more costly attorney hours. Supplemental Order Awarding Attorneys' Fees at 9. The City's position also is at odds with recent Supreme Court precedent. *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (recognizing right to compensation for law student time). Furthermore, the declarations provided by counsel establish that the $70 hourly rate sought is within the community standard. See Saperstein, Hunt and Mayer Decls., *supra* p. 34.

Having considered all relevant *Kerr* factors and the arguments of counsel, the court finds that the rates requested by applicants are reasonable. The lodestar amount for all attorneys and paralegals is set forth in the accompanying Appendix.

### III. *Enhancement of the Lodestar*

██ A strong presumption exists that the lodestar figure is the reasonable fee and it is only in rare cases that figure will be adjusted. *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir.1987); *Clark v. City of Los Angeles*, 803 F.2d 987, 991 (9th Cir.1986). Where an upward adjustment is made, it must be "supported by specific evidence on the record and detailed findings by the district court." *Jordan*, 815 F.2d at 1262. For fee enhancement to occur, two prerequisites must be met:[12]

> First, the fee applicant must establish that "without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" Second, any enhancement for contingency must reflect "the difference in market treatment of contingent fee cases *as a*

*class*, rather than ... the 'riskiness' of any particular case."

*Fadhl v. City and County of San Francisco*, 859 F.2d 649, 650 (9th Cir.1988) ("*Fadhl II*") (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 733, 731, 107 S.Ct. 3078, 3090, 3089, 97 L.Ed.2d 585 (1987) ("*Delaware Valley II*") (O'Connor, J., concurring) (emphasis in original)).

### A. Difficulty in Finding Counsel

Robert Demmons, one of the individual plaintiffs-in-intervention and president of the San Francisco Black Firefighters Association, itself an organizational plaintiff-in-intervention, submitted a declaration attesting that he had contacted at least twenty-five attorneys prior to obtaining counsel. Demmons Decl. para. 3. According to Demmons, the attorneys who declined to take the case did so primarily out of an unwillingness to take on the City of San Francisco and an unwillingness to risk the time and money involved. *Id.*

Defendants contest the degree of difficulty that plaintiffs experienced in retaining counsel. They maintain that Mr. Demmons and Ms. Paterson are unable to provide any specific evidence of the names of attorneys whom they attempted to recruit or the reasons the attorneys refused. In reply, Mr. Demmons lists the names of eight attorneys or legal organizations whom he solicited. He reiterates that the attorneys objected to the "tremendous risk and time commitment involved." Demmons Reply Decl. para. 2. Two of the attorneys contacted furnished affidavits confirming plaintiffs' representations. Beasley Decl. para. 3; Moore Decl. para. 5.

Nevertheless, the City argues that once counsel for the Black Firefighters Association was acquired, plaintiffs retained the

---

**12.** Plaintiffs present two additional bases for fee enhancement. First, they contend that the exceptional nature of the success achieved is a proper basis for enhancement. *See White v. City of Richmond*, 713 F.2d 458, 462 (9th Cir. 1983). That contention is discussed in the text below. Plaintiffs also argue that the lodestar should be enhanced because of the preclusion of other employment. They provide evidence of the inability of counsel to pursue other work.

*See, e.g.,* McNeill Decl., para. 10. However, this court believes that the preclusion of other employment was accounted for in the earlier determination of the number of hours reasonably expended. Although neither the Supreme Court nor the Ninth Circuit have rejected consideration of that factor in a fee enhancement, in the present case it is properly subsumed within the lodestar figure.

balance of class counsel relatively easily. Local 798 adds that since the Department of Justice was planning to file suit on plaintiffs' behalf, they already had counsel before retaining present counsel.[13] Consequently, the City and the Union argue that the plaintiffs cannot meet Justice O'Connor's requirement of a showing that without an enhancement they would have experienced substantial difficulty in obtaining counsel.

However, plaintiffs need not establish the actual difficulty in finding counsel for their particular case, although on this record they have done so. It is sufficient to establish that such a difficulty would exist for Title VII cases in the San Francisco area as a class, absent an enhancement. This standard has been accepted in this circuit as well as in the D.C. Circuit. *Fadhl II*, 859 F.2d at 650–51; *Bucci v. Chromalloy Am. Corp.*, 53 Empl.Prac.Dec. (CCH) ¶ 39,882 at 62,300, 1989 WL 222441 (N.D.Cal. Sept. 15, 1989); *McKenzie v. Kennickell*, 875 F.2d 330, 337 (D.C.Cir.), *reh'g denied*, 884 F.2d 1405 (D.C.Cir.1989). In elucidating the rationale for a standard not tied to a specific case, the D.C. Circuit explained:

> A standard of actual difficulty ... would have perverse effects in practice. It would penalize plaintiffs who were lucky enough to stumble across on their first try the one-in-a-hundred lawyer who was willing to take their case. It would also discourage referral services such as the Lawyers' Committee that make it easier for litigants to find legal representation. [citations omitted]. Finally, it would lead to a charade in which clients seeking representation under fee-shifting statutes would be steered to several attorneys whose pre-arranged role it would be to "refuse" the case, knowing that such refusals were necessary to permit the eventual award of fees. For these reasons, we conclude that applicants need not show that plaintiffs actually experienced difficulty in obtaining representation. They must only establish, accord-

ing to the test formulated by Justice O'Connor, that plaintiffs *would have* faced "substantial difficulties" in the absence of a contingency enhancement.

*McKenzie*, 875 F.2d at 337 (emphasis in original). This court agrees with the reasoning of the D.C. Circuit.

Plaintiffs' counsel, who collectively constitute a large segment of the local public interest bar, submitted declarations regarding the difficulty of referring Title VII cases to private attorneys. *See, e.g.*, Paterson Decl. para. 5 (Lawyers' Committee for Urban Affairs); Hulett Decl. para. 22 (MALDEF); Lee Decl. para. 10 (Asian Law Caucus); Marshall Decl. para. 12 (Equal Rights Advocates); Supp. Dunlap Decl. II paras. 2–4 (relating conversation with former coordinator of this district's Title VII-related Civil Legal Assistance Panel, attesting that project terminated due to lack of attorneys).

Moreover, plaintiffs have augmented their case with declarations from area Title VII and public interest attorneys. Supp. Saperstein Decl. paras. 6–7 (noting exodus of experienced plaintiff's attorneys from employment discrimination litigation); Sheehan Decl. para. 4 (17–year public interest attorney attesting that none of fourteen Northern California legal services firms would take Title VII class action cases). Plaintiffs have amply demonstrated the "general dearth of counsel willing to accept [Title VII] suits...." *McKenzie v. Kennickell*, 684 F.Supp. 1097, 1103 (D.D.C.1988), *aff'd*, 875 F.2d 330 (D.C.Cir.), *reh'g denied*, 884 F.2d 1405 (D.C.Cir.1989).

Defendants also argue that there is no evidence that any class counsel were themselves motivated by the prospect of a fee enhancement. This argument is troubling. On this theory, the self-aggrandizing attorney would be rewarded; the altruistic would be penalized. Again, defendants seek an overly particularized standard. Plaintiffs are not required to establish the precise motivation of the counsel whom they ultimately retain. As the D.C. Circuit noted in *McKenzie*, 875 F.2d at 338, such a

---

**13.** In fact, the presence of the United States may have cut both ways. The position of the Justice Department was likely to be at odds with plaintiff-intervenors in significant respects. Thus, a knowledgeable Title VII lawyer would likely be faced with a two-edged, if not three-edged, sword.

requirement would lead to differential treatment of public interest firms in fee petitions, a result condemned by the Supreme Court in *Blum*, 465 U.S. at 894, 104 S.Ct. at 1546 (1984) [14]. Plaintiffs will meet the requirements of *Delaware Valley II* if they can satisfy the general standard set forth above.

Plaintiffs' counsel, as well as numerous declarants including two of the unsuccessfully solicited attorneys, attested to the fact that the potential for a fee multiplier would improve the ability to attract counsel to civil rights cases. Hulett Decl. para. 22; Lee Decl. para. 10; Beasley Decl. para. 4; Moore Decl. para. 5; Baller Decl. para. 15.

Furthermore, there is sufficient authority on the difficulty in finding counsel for Title VII cases in the San Francisco area without an enhancement. In *Fadhl II*, the Ninth Circuit recognized "the extraordinary difficulty [plaintiff] encountered in retaining counsel, and the manifest need in San Francisco for fee enhancement in civil rights cases." *Fadhl II*, 859 F.2d at 651; *accord, Clark v. City of Los Angeles*, 803 F.2d at 991 (upward adjustment justified where at least 10 attorneys had previously turned down case); *Bradshaw v. United States Dist. Court*, 742 F.2d 515, 516 (9th Cir.1984) (20 attorneys reject case, court refers to district court's finding that chief reason was lack of compensation for time-consuming, complex litigation); *Bucci v. Chromalloy*, 53 Empl.Prac.Dec. (CCH) ¶ 39,882 at 62,300 (N.D.Cal. Sept. 15, 1989). The foregoing authority, declarations and affidavits abundantly demonstrate the dif-

ficulty in obtaining counsel. The existence of an enhancement may motivate more attorneys to accept Title VII cases.

**B. Market Treatment of Contingent Fee Cases**

The second prong of the inquiry into the availability of a multiplier focuses on how the relevant market compensates for the risk of loss incurred by plaintiffs' counsel [15]. *Delaware Valley II*, 483 U.S. at 733, 107 S.Ct. at 3090 (O'Connor, J., concurring). Once such a determination has been made for the relevant market, it must control future cases. *Id.* Consequently, this court need not engage in any pioneering analysis on market compensation, for it has already been aided by other courts in this district.

In *Fadhl II*, the Ninth Circuit upheld the district court's determination that the San Francisco market compensates for risk in Title VII cases through a 100% enhancement on fees. Although the City argues that *Fadhl II* is too fact specific to be dispositive on the multiplier issue, the court in *Fadhl II* expressly recognized that the multiplier conformed with precedent: "The 2.0 multiplier is consistent with the unrebutted testimony as to compensation required in the San Francisco market and is generally 'in line' with allowances in fee cases in this circuit." *Fadhl II*, 859 F.2d at 651 (citing *Clark*, 803 F.2d 987 (9th Cir. 1986) (1.5 multiplier applied)). Other courts in this district have also allowed a multiplier of 2.0. *See, e.g., Bucci v. Chromalloy*, 53 Empl.Prac.Dec. (CCH) ¶ 39,882 at 62,300 (N.D.Cal. Sept. 15, 1990).[16]

---

**14.** The fee applicants also cite *Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989) as support for the argument that whether or not counsel accepted the case in anticipation of a fee enhancement is irrelevant. Although the proposition is correct, the case cited is inapposite. In *Blanchard*, the Court ruled that "[t]he attorney's fee provided for in a contingent fee agreement is not a ceiling upon the fees recoverable under § 1988." *Id.* 109 S.Ct. at 946.

**15.** The City engages in additional argument over the riskiness of this particular case. But the award of a contingency-based multiplier does not depend upon the riskiness of a particular case before the court. "[C]ompensation for contingency must be based on the difference in market treatment of contingent fee cases *as a*

*class*, rather than on an assessment of the 'riskiness' of any particular case." *Delaware Valley II*, 483 U.S. at 731, 107 S.Ct. at 3089 (O'Connor, J., concurring) (emphasis in original).

**16.** The plaintiffs also cite *Gomez v. City of Watsonville*, No. C–85–20319 WAI (N.D.Cal. April 11, 1990) for evidence of the 2.0 multiplier used in the San Francisco area. In *Gomez*, the district court enhanced the lodestar to reflect "the novelty of the issues in this action, the contingent nature of the representation by plaintiffs' counsel, the demonstrated lack of any other competent counsel available in the area, and the resounding success of plaintiffs' counsel's conducting of the case...." *Id. Gomez* taken alone is insufficient to establish the standard for the local multiplier. The court utilized a factor,

Moreover, even absent existing precedent, there is ample evidence that a multiplier of 2.0 for contingency is typical in the San Francisco area. Cooper Decl. para. 8 (2.0 to 3.5 multiplier); Scarpulla Decl. para. 5 (2.0 to 4.0 multiplier); Supp. Saperstein Decl. para. 10 (2.0 multiplier); Mayer Decl. para. 8 (same); Baller Reply Decl. para. 4 (same). The City submitted opposing declarations of two attorneys whose firms' practices are limited almost exclusively to contingency fee cases. The attorneys each averred that their firms make no calculation based on a multiple of regular fees in deciding what cases to take. Cartwright Decl. at 3; Cox Decl. at 2. Those declarations taken alone are not decisive, given the prior case law and submissions of the fee applicants.

The City also contends that, notwithstanding the suitability of a 2.0 multiplier in other cases, Supreme Court and Ninth Circuit precedent preclude the application of a multiplier in this case.[17] However, none of the cases cited preclude the application of a multiplier; they simply establish that an enhancement is warranted in few instances and that several of the *Kerr* factors cannot serve as independent bases for such enhancement. *See, e.g., Jordan,* 815 F.2d at 1262 & n. 6. The court deems the present case to be one of the unusual instances where a multiplier is justified, and has computed the multiplier without relying on impermissible *Kerr* factors. Instead, it is based on the market treatment of contingent fee cases in this area.

C. Additional Enhancement for Exceptional Success

Although the Supreme Court allows an additional enhancement to the lodestar due to exceptional success, it is only in rare cases. *Delaware Valley I,* 478 U.S. at 565–66, 106 S.Ct. at 3098–99; *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548.

Ordinarily, consideration of the results obtained by a prevailing party is incorporated within the lodestar determination and cannot be used twice. *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098; *Jordan,* 815 F.2d at 1262 n. 6.

Plaintiffs argue that they have achieved "what no one else has been able to do for many years: obtain an order mandating the racial and sexual integration of the San Francisco Fire Department from top to bottom." Pl. MPA in Support of Motion for an Award of Reasonable Att. Fees (filed 12/2/89) at 22. They assert that this accomplishment, in light of the long and arduous resistance of the City and Local 798 as well as the inconsistent position of the United States Department of Justice in the latter stages of litigation, is truly exceptional. Moreover, they maintain that the consent decree is so extraordinary in scope that it is almost peerless. In support of this contention, they submit the declaration of Barry Goldstein, associate counsel for the NAACP Legal Defense and Educational Fund.

The City and Local 798 seek to minimize the contributions of plaintiffs' counsel to the results obtained. The City argues that the relief achieved was to be expected given the experience of plaintiffs' counsel. The City also maintains that the credit due to fee applicants for the results achieved is undercut by the fact that the consent decree reflects the joint efforts of plaintiffs' counsel, the City, the Justice Department (through its earlier partial summary judgment motion) and this court. However, the City's efforts came only after months of opposition and the Justice Department did not participate in the settlement negotiations. The City further contends that the decree does not represent original work of plaintiffs' counsel but instead follows from the decree in *Officers for Justice v. Civil Service Comm'n of the City and County*

"the novelty of the issues," which the Ninth Circuit has held cannot be the basis for awarding a multiplier. Furthermore, the court provided an extremely skimpy two-page analysis to support its fee award. Nevertheless, since *Gomez* also based the fee award on permissible grounds, it demonstrates the consistency of a 2.0 multiplier in this market.

**17.** The City also argues that *Wood v. Sunn,* 865 F.2d 982, 991 (9th Cir.1988) establishes a cap of 33% for any multiplier awarded. However, *Wood* is no longer good law. It has been vacated. *Wood v. Sunn,* 880 F.2d 1011 (9th Cir.1989).

*of San Francisco,* 473 F.Supp. 801 (N.D. Cal.1979), *aff'd,* 688 F.2d 615 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). For its part, Local 798 asserts that the fee applicants deserve less credit for the results achieved since the Union, rather than plaintiffs' counsel, was responsible for the inclusion of Hispanics and Asians in the promotional relief granted under the decree.

A detailed response to the arguments of counsel is unnecessary because the court declines to augment the fee award for exceptional success. That is not to say that the court does not consider the results achieved to be outstanding, despite the attempts of the City and Union to denigrate the work of plaintiffs' counsel. However the fee applicants' success was well accounted for in calculating their reasonable hourly rate. Moreover, the 2.0 multiplier awarded in recognition of the market treatment of contingency cases also serves to adequately compensate the fee applicants for their success herein.[18]

### IV. *Request for Attorney's Fees Against Local 798*

█ Plaintiff-intervenors seek an award of fees against Local 798, a defendant-intervenor in this action. The Supreme Court held recently that district courts should "award Title VII attorney's fees against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation." *Independent Fed'n of Flight Attendants v. Zipes,* 491 U.S. ——, ——, 109 S.Ct. 2732, 2736, 105 L.Ed.2d 639 (1989). The rationale for this holding was that those who have not been found to have violated any person's civil rights should not be presumptively liable for fees. *Id.* 109 S.Ct. at 2737. Such liability would promote neither the general policy of making a wrongdoer compensate

for injuries nor the Title VII goal of deterring discriminatory behavior.

Intervenors may still be subject to fee awards in certain circumstances, for example where they intervene in order to avoid liability for violation of the law and thus are functionally defendants.[19] However, no fee award is permissible against defendant-intervenors in the case at bar. While the attorneys' fee motion was under consideration, the Ninth Circuit affirmed this court's approval of the consent decree. In its affirmance, the circuit court rejected a request for attorney's fees on appeal sought by the plaintiff-intervenors against Local 798. The court stated:

> Here, as in *Zipes,* the Union intervened to protect the interests of incumbent employees, an act that was neither frivolous, unreasonable or without foundation. [citation omitted]. Following the reasoning in *Zipes,* we decline to award attorney fees as costs to Davis for this appeal.

*Davis v. City and County of San Francisco,* 890 F.2d 1438, 1452 (9th Cir.1989), *petition for cert. filed* (Aug. 7, 1990) (No. 90–248).

The fee applicants argue that, even if the Union is not liable, the City should be required to pay the costs of the Local's intervention. However, *Zipes* precludes such a result. The *Zipes* majority noted that the losing defendant in a Title VII suit will be liable "for all of the fees expended by the plaintiff in litigating the claim against *him.*" *Zipes,* 109 S.Ct at 2736 (emphasis added). Both the concurring and dissenting opinions in *Zipes* agreed that, in using "him," the majority intended to disallow the levying of intervenor-related costs against the losing defendant. *Id.* at 2739, 2743–44 (concurring and dissenting opinions).

---

**18.** The City also contends that any multiplier that is awarded should be reduced because of the asserted lack of difficulty in finding counsel for most of the clients and because the risk of not prevailing in this case diminished over time. However, as discussed earlier, a court must analyze both of these factors with respect to a class of cases, rather than with respect to the particular case before it.

**19.** The flight attendants union in *Zipes* intervened to protect the seniority rights of its membership. The Court's ruling in *Zipes* shields from fee liability only those intervenors "who enter lawsuits to defend their own constitutional or statutory rights." 109 S.Ct. at 2738, n. 4. Consequently, intervenors remain liable for any actions taken which place them in a role as functional defendants.

The fee applicants have submitted declarations allocating hours attributable solely to Union litigation activities. Pearl Decl. Re: Allocation of Hours to Local 798. In light of the clear unavailability of compensation from the Union, rather than being used to augment the overall fee award, the hours accounted for in those declarations must serve to reduce the award.[20] The deductions shall be allocated among the attorneys in accordance with their submissions as follows: Ms. Paterson—14.7 hours; Mr. McNeill—5.8 hours from Pearl, McNeill & Gillespie, 19.6 hours from the Culver Law Firm and 1.8 hours from his time as a sole practitioner; Ms. Marshall—22.1 hours; Ms. Hulett—27.7 hours; Mr. Lee—19.8 hours; Ms. Dunlap—4.7 hours; Mr. Galloway—8.1 hours; Mr. Pearl—24.5 hours.

Notwithstanding the general unavailability of fees from the defendant-intervenor in this action, a small subset of its litigation activity is subject to a fee award. Where an intervenor's action is frivolous, unreasonable or without foundation, an award is permissible. *Zipes*, 109 S.Ct. at 2736. In October 1986, on the eve of trial, the City abandoned the defense of the challenged H2, H4 and H20 examinations. Despite this, the Union stubbornly persisted in asserting the tests' validity. This court noted, in its Memorandum and Order of February 26, 1987, that the Union's position was "fundamentally misplaced and wholly without authority." *Davis I*, 656 F.Supp. at 282 n. 5. Accordingly, plaintiff-intervenors, as prevailing parties on the issue of the invalidity of the challenged examinations, are owed attorneys' fees from Local 798 to the extend that fees are attributable to the additional effort of Local 798. Plaintiff-intervenors are directed to submit a declaration detailing solely those hours spent responding to the Union's defense of the tests; fees will be awarded accordingly.

## V. *Fee Award for Fee Counsel*

Time spent establishing the right to compensation for attorneys' fees is itself compensable. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 661 (9th Cir.1985); *Manhart v. City of Los Angeles, Dept. of Water and Power*, 652 F.2d 904, 909 (9th Cir.1981), *vacated on other grounds*, 461 U.S. 951, 103 S.Ct. 2420, 77 L.Ed.2d 1310 (1983). The City accepts the right in general, but questions the need for separate fee counsel in this case, arguing that needless time was expended in orienting new counsel. The City further contends that fee counsel's requested hourly rate is excessive and unsupported.

The argument regarding time spent in orientation of new counsel is unpersuasive. Since it is permissible for separate counsel to litigate the fee award, it follows naturally that such counsel must familiarize themselves with the case in order to render competent service. The requested hours are well-documented and in fact the City lodges no complaint regarding any specific hours. Furthermore the total number of hours expended, just under 600, is quite reasonable given the vigor with which the City challenged the fee petition. The defendant's broad-based attack on the appropriateness of the hours spent is unavailing. Mr. Pearl's requested hours, save the 24.5 allocable solely to Local 798, are compensable.

The City's challenge of fee counsel's requested hourly rate likewise must fail. As in the case of the rate for plaintiffs' counsel, fee counsel's rate is determined by reference to the prevailing rate in the community for attorneys of like skill, reputation and experience. Attorney Pearl has adequately documented his two decades of experience as a public interest attorney and, most recently as an expert on court-awarded attorneys' fees. The prevailing rate for comparable attorneys is supported by declarations of Guy Saperstein (same years of experience as Pearl, $275 per hour) and Steve Mayer (attorneys with comparable experience at declarant's firm bill at $250 to $265 per hour). Those declarations, coupled with earlier declarations submitted in support of the rates of plain-

---

**20.** Plaintiff-intervenors bear some responsibility for the denial of their fee request from Local 798. Given the Union's early and contentious intervention, it is surprising that the plaintiff-intervenors never named it as a defendant, an act which ultimately would have resulted in fee liability.

tiffs' counsel, sufficiently establish the reasonableness of the fee counsel's rates.

## VI. *Compensable Costs*

The plaintiff-intervenors have included a request for costs in their fee application. The City opposes the award of any costs, arguing that plaintiff-intervenors could be awarded no more than $30 a day for expert witness fees and that they have not adequately documented any costs. As discussed below, the court finds these arguments to be unavailing.

### A. Expert Witness Fees

The City maintains that this court must observe a cap of $30 per day on expert witness fees pursuant to *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987). The *Crawford* Court addressed the issue of the district courts' discretion to levy costs under Federal Rule of Civil Procedure 54(b) and held that: "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." *Id.* Section 1920(3) sets out witness fees as taxable costs and section 1821(b) limits witness fees to a $30 per day. Both the concurring and dissenting opinions in *Crawford* highlighted the fact that the Court did not have before it the issue of whether a court may award expert witness fees separately, under 42 U.S.C. § 1988. Nevertheless, a number of courts have extended the case to bar excess awards in civil rights and Title VII cases.[21] The City invites this court to follow them, citing *Pacific West Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 876 (E.D. Cal.1988) for its argument that Ninth Circuit authority for expert witness fee awards is founded on Rule 54(b) and is thus discredited by *Crawford*.

In dicta, the *Pacific West* court considered and rejected the propriety of an award of witness fees in excess of the statutory limit after *Crawford*. The court noted that the Ninth Circuit approach on fees and costs in Title VII cases is to evaluate attorneys' fees and certain costs under 42 U.S.C. § 2000e–5(k), but to evaluate witness fees separately under Rule 54(b) and related statutes. *Pacific West Cable*, 693 F.Supp. at 876 (citing *Thornberry v. Delta Air Lines*, 676 F.2d 1240, 1245 (9th Cir.1982), *vacated on other grounds*, 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983)). Since *Crawford* curtailed the award of excess witness fees under Rule 54(b), the court reasoned: "unless the Ninth Circuit, when squarely presented with the issue, finds the authority for recovery of these costs within section 1988, it appears that those excess costs are not now recoverable." *Pacific West Cable*, 693 F.Supp. at 876. The court agrees that, if excess witness fees are unavailable under section 1988, they are arguably also unavailable under section 2000e–5(k), since the two fee-shifting statutes "are to be interpreted alike." *Zipes*, 109 S.Ct. at 2735 n. 2. However, this court rejects the City's argument that such fees are noncompensable in this case, instead finding common cause with those courts ruling to the contrary.

Since *Crawford*, the Ninth Circuit has ruled that out-of-pocket litigation expenses are still reimbursable as part of a civil rights attorney's fee, although the court has not specifically held that witness fees are included. *United Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir.1990). The award of expert witness fees for civil rights attorneys is consistent with the recognition in this circuit that, in order to fully effectuate the congressional purposes behind Title VII, courts must have "the option to allow plaintiffs to re-

---

**21.** *Denny v. Westfield State College*, 880 F.2d 1465 (1st Cir.1989) (Title VII expert witness fee cap of $30 per day); *Gilbert v. City of Little Rock*, 867 F.2d 1062 (8th Cir.1989) (en banc decision affirming, by equally divided vote, lower court decision capping witness fees under § 1988 at $30 per day), *cert. denied*, —— U.S. ——, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); *West Virginia Univ. Hosps. v. Casey*, 885 F.2d 11, 34 (3d Cir.1989) (section 1988 witness fee cap $30 per day), *cert. denied*, —— U.S. ——, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990); *Sevigny v. Dicksey*, 846 F.2d 953, 959 (4th Cir.1988) ("§ 1988 does not provide statutory authority for the awarding of compensation for non-legal experts"); *Noble v. Herrington*, 732 F.Supp. 114, 119 (D.D.C.1989) (Title VII cap of $30 per day).

cover the full costs of litigation." *Thornberry*, 676 F.2d at 1245.

In *Friedrich v. City of Chicago*, 888 F.2d 511 (7th Cir.1989), *petition for cert. filed* (Jan. 29, 1990) (No. 89–1230), the court ruled that *Crawford's* limit on witness fees only applied to time spent by a witness in court. The court noted that non-testimonial time spent by experts, in particular time spent educating counsel, was analogous to paralegal time which was found to be compensable in *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). The court reasoned that "[t]o forbid the shifting of the expert's fee would encourage underspecialization and inefficient trial preparation, just as to forbid shifting the cost of paralegals would encourage lawyers to do paralegals' work." *Friedrich*, 888 F.2d at 514. Accordingly, the court held that, regardless of the compensability of time spent on the stand by an expert, time spent in educating an attorney was essentially part of the attorney's work product and was thus compensable as part of reasonable fees. *Id.; accord, Denny v. Westfield State College*, 880 F.2d 1465, 1474 (1st Cir.1989) (Breyer, J., concurring) (expert's fee in Title VII case may involve far more than simply appearing in court and could be work that falls within the scope of a reasonable attorneys' fee). Moreover, the court noted that time spent preparing to testify may also serve to educate counsel and thus may be compensable on that basis.

■ In the present case, the expert witness fees for which compensation is sought

are perhaps better denominated consulting fees. Both of the relevant experts used by the fee applicants submitted affidavits; neither testified in court, though the City did depose Mr. Baller. Since no fees are sought for actual in-court attendance, the limit of section 1821 of "$30 per day for each day's attendance" is inapplicable and reasonable fees are awardable.

Moreover, although this court need not reach the issue of the effect of *Crawford* on fee awards for in-court expert witnesses in Title VII cases, several courts have rejected its extension. *Friedrich*, 888 F.2d at 518 (Congress intended that section 1821 cap does not apply to section 1988–based fees);[22] *Williams v. City of New York*, 728 F.Supp. 1067, 1071–72 (S.D.N.Y.1990) ($30 per day limit inapplicable to section 1988 cases); *Maturo v. National Graphics, Inc.*, 722 F.Supp. 916, 932–33 (D.Conn. 1989) (*Crawford's* limit on witness fees not applicable where fees awarded under fee-shifting statute); *Black Grievance Comm. v. Philadelphia Elec. Co.*, 690 F.Supp. 1393, 1403 (E.D.Pa.1988) (interpreting *Crawford* to mean that, as to section 1988, the $30 per day limitation is repealed); *cf. Mennor v. Fort Hood Nat'l Bank*, 829 F.2d 553, 557 (5th Cir.1987) (42 U.S.C. § 2000e–5(k) does not overrule limit on statutory costs but includes reasonable out-of-pocket expenses normally charged to fee-paying clients).[23]

The City's contrary authority, *Seven Gables Corp. v. Sterling Recreation Org.*, 686 F.Supp. 1418, 1421 (W.D.Wash.1988), is un-

---

**22.** The *Friedrich* court ruled that, in enacting section 1988, Congress intended to restore courts' equitable power to shift litigation expenses in the aftermath of a contrary ruling in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The *Friedrich* court reasoned further that, given the long-held understanding that fee-shifting pursuant to equitable powers does not come within the ambit of statutory caps, Congress' enactment of section 1988 placed civil rights fees outside the reach of those limits as well. *Friedrich*, 888 F.2d at 518. This holding is limited to section 1988, however its extension to Title VII is plausible, given the identical language and similar legislative purpose of section 2000e–5(k).

**23.** *SapaNajin v. Gunter*, 857 F.2d 463, 465 (8th Cir.1988) provides further support for the general proposition that witness fees in civil rights cases are beyond the reach of section 1821. In *SapaNajin*, the plaintiff prevailed on a First Amendment claim and sought expert witness fees as an expense under section 1988. In answer to the defendant's contention that *Crawford* capped such fees, the court explained that, since the fees were not awarded as a taxation of costs under 28 U.S.C. § 1821, but rather as an expense under section 1988, the $30 per day limit was inapplicable. *But see Gilbert v. City of Little Rock*, 867 F.2d 1062 (8th Cir.1989) (en banc decision affirming, by equally divided vote, lower court decision capping witness fees under § 1988 at $30 per day), *cert. denied,* —— U.S. ——, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

persuasive, as it involved interpretation of the Clayton Act, 15 U.S.C. § 15(a) and thus did not take into account the legislative purposes of Title VII and section 1988.

 In light of the foregoing authorities and the policy of encouraging litigation of Title VII suits through adequate compensation, the court finds that reasonable witness fees, at least for activities other than court attendance, if not more, are available as a component of attorneys' fees under Title VII and section 1988. Nevertheless, there is some limit on those fees. Under Ninth Circuit precedent, where witness fees are taxed under Rule 54(b), they are available only upon a finding that the expert testimony was crucial or indispensable in establishing the prevailing party's case. *United States v. City of Twin Falls*, 806 F.2d 862, 878 (9th Cir.1986), *cert. denied*, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987). Although the witness fees in the case at bar are sought as a part of reasonable attorneys' fees under Title VII, not under Rule 54(b), the court adheres to the "indispensability" standard and limits the award to solely Mr. Baller's fees.

Mr. Baller's testimony provided critical support for the plaintiffs' position on the need for a multiplier to attract competent counsel. The court accorded Mr. Baller's testimony considerable weight, given that the bulk of the remaining relevant testimony was less objective, coming from plaintiffs' counsel. Mr. Goldstein's testimony, on the other hand, was directed at the exceptional nature of the success obtained. Given that the court found that a risk-based multiplier was sufficient, without a supplemental enhancement for exceptional success, Mr. Goldstein's affidavit was not crucial. The amount of his fee, $6,820, will not be awarded to plaintiffs' counsel.

## B. Documentation of Costs

The City contends that the costs requested by the fee applicants are inadequately documented. It asserts that Mr. McNeill's submissions include unexplained travel costs, that the Lawyers' Committee for Urban Affairs has provided minimal documentation and that Equal Rights Advocates has not established that its claimed expenses are compensable.

However, the City's position is untenable. The plaintiff-intervenors provided approximately one hundred pages of receipts in support of their cost figures in response to the City's discovery request. Pl. Reply MPA at 34. *See* Response to Request for Production of Documents, Ex. 30. Moreover, the magnitude of costs requested given the scope and duration of the litigation, is reasonable.[24]

## CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part plaintiff-intervenors' motion for an award of reasonable attorneys' fees. The fee applicants are awarded fees and costs as set forth in detail in the accompanying appendix. The lodestar amount of attorneys' fees is $1,746,681.63. Application of the 2.0 multiplier yields a total fee award of $3,493,363.26. Costs are awarded in the amount of $74,916.64.

IT IS SO ORDERED.

## APPENDIX
## LODESTAR CHART
(Through September 18, 1989)

| ATTORNEYS | YEAR ADMITTED | HOURLY RATE | HOURS | UNADJUSTED LODESTAR FEE | 5% BILLING ADJUSTMENT | LODESTAR FEE AWARDED | ENHANCED FEE AWARDED |
|---|---|---|---|---|---|---|---|
| Asian Law Caucus | | | | | | | |
| E. Lee | 1979 | $170 | 598.55 | $101,753.50 | [$5,087.68] | $96,665.83 | $193,331.66 |

**24.** The City also argued that plaintiff-intervenors failed to segregate allowable costs from disallowed ones. However, given that both expert witness costs and other costs have been allowed, no segregation was needed and this argument fails.

| ATTORNEYS | YEAR ADMITTED | HOURLY RATE | HOURS | UNADJUSTED LODESTAR FEE | 5% BILLING ADJUSTMENT | LODESTAR FEE AWARDED | ENHANCED FEE AWARDED |
|---|---|---|---|---|---|---|---|
| **Culver Law Firm** | | | | | | | |
| W. McNeill | 1971 | $230 | 357.95 | $ 82,328.50 | [$4,116.43] | $ 78,212.08 | $ 156,424.16 |
| Mary C. Dunlap | 1972 | 230 | 364.00 | 83,720.00 | [4,186.00] | 79,534.00 | 159,068.00 |
| **Employment Law Center** | | | | | | | |
| W. McNeill | 1971 | 230 | 176.90 | 40,687.00 | [2,034.35] | 38,652.65 | 77,305.30 |
| **Equal Rights Advocates** | | | | | | | |
| S. Marshall | 1979 | 170 | 1053.85 | 179,154.50 | [8,957.73] | 170,196.78 | 340,393.56 |
| T. Chaw | 1980 | 160 | 109.90 | 17,584.00 | [ 879.20] | 16,704.80 | 33,409.60 |
| D. Hitchens | 1977 | 190 | 62.50 | 11,875.00 | [ 593.75] | 11,281.25 | 22,562.50 |
| Russell Galloway | 1969 | 235 | 617.90 | 145,206.50 | [7,260.33] | 137,946.18 | 275,892.36 |
| **MALDEF** | | | | | | | |
| T. Bustillos | 1980 | 160 | 67.50 | 10,800.00 | [ 540.00] | 10,260.00 | 20,520.00 |
| F. Garcia-Rodriguez | 1980 | 160 | 85.30 | 13,648.00 | [ 682.40] | 12,965.60 | 25,931.20 |
| D. Hulett | 1985 | 110 | 880.80 | 96,888.00 | [4,844.40] | 92,043.60 | 184,087.20 |
| William C. McNeill | 1971 | 230 | 190.65 | 43,849.50 | [2,192.48] | 41,657.03 | 83,314.06 |
| **Pearl, McNeill & Gillespie** | | | | | | | |
| W. McNeill | 1971 | 230 | 1813.85 | 417,185.50 | [20,859.28] | 396,326.23 | 792,652.46 |
| **S.F. Lawyers' Committee for Urban Affairs** | | | | | | | |
| E. Jefferson Paterson | 1975 | 220 | 1523.70 | 335,214.00 | [16,760.70] | 318,453.30 | 636,906.60 |
| M. Blanco | 1984 | 120 | 486.55 | 58,386.00 | [2,919.30] | 55,466.70 | 110,933.40 |
| **Law Offices of Richard M. Pearl** | | | | | | | |
| R. Pearl | 1969 | 235 | 374.85 | 88,089.75 | [4,404.88] | 83,685.26 | 167,370.52 |
| L. Hess | 1986 | 100 | 60.20 | 6,020.00 | [ 301.00] | 5,719.00 | 11,438.00 |
| E. O'Donnell | | 90 | 44.45 | 4,000.05 | [ 200.00] | 3,800.05 | 7,600.10 |
| | | 70 | 76.60 | 5,362.00 | [ 268.10] | 5,093.90 | 10,187.80 |
| **Post December 2, 1988 Work on Fee Issue** | | | | | | | |
| E. Jefferson Paterson | 1975 | 220 | 49.07 | 10,795.40 | [ 539.77] | 10,255.63 | 20,511.26 |
| W. McNeill | 1971 | 230 | 39.70 | 9,131.00 | [ 456.55] | 8,674.45 | 17,348.90 |
| S. Marshall | 1979 | 170 | 25.30 | 4,301.00 | [ 215.05] | 4,085.95 | 8,171.90 |
| M. Dunlap | 1972 | 230 | 23.90 | 5,497.00 | [ 274.85] | 5,222.15 | 10,444.30 |
| R. Galloway | 1969 | 235 | 46.59 | 10,948.65 | [ 547.43] | 10,401.22 | 20,802.44 |
| D. Hulett | 1985 | 110 | 7.40 | 814.00 | [ 40.70] | 773.30 | 1,546.60 |
| **ATTORNEY'S FEES SUBTOTAL:** | | | | | | $1,694,076.80 2 | $3,388,153.60 |
| **PARALEGALS/ LAW STUDENTS** | | | | | | | |
| **Equal Rights Advocates** | | | | | | | |
| (Several) | | 70 | 383.15 | 26,820.50 | [ 134.13] | 25,479.48 | 50,958.96 |
| **MALDEF** | | | | | | | |
| M. Adams | | 70 | 74.30 | 5,201.00 | [ 260.05] | 4,940.95 | 9,881.90 |
| **Law Offices of Mary C. Dunlap** | | | | | | | |
| E. Herzstein | | 70 | 23.50 | 1,645.00 | [ 82.25] | 1,562.75 | 3,125.50 |

| ATTORNEYS | YEAR ADMITTED | HOURLY RATE | HOURS | UNADJUSTED LODESTAR FEE | 5% BILLING ADJUSTMENT | LODESTAR FEE AWARDED | ENHANCED FEE AWARDED |
|---|---|---|---|---|---|---|---|
| S.F. Lawyers' Committee for Urban Affairs | | | | | | | |
| V. Edwards | | $70 | 180.00 | $12,600.00 | [$ 630.00] | $11,970.00 | $23,940.00 |
| M. Adams | | 70 | 105.00 | 7,350.00 | [ 367.50] | 6,982.50 | 13,965.00 |
| Pearl, McNeill & Gillespie | | | | | | | |
| L Hess | | 70 | 8.10 | 567.00 | [ 28.35] | 538.65 | 1,077.30 |
| Law Offices of Richard Pearl | | | | | | | |
| D. Collins | | 70 | 10.00 | 700.00 | [ 35.00] | 665.00 | 1,330.00 |
| G. Gough | | 70 | 7.00 | 490.00 | [ 24.50] | 465.50 | 931.00 |
| PARALEGALS/LAW STUDENTS SUBTOTAL: | | | | | | $52,604.83 | $105,209.66 |
| FEES TOTAL: | | | | | | $1,746,681.63 | $3,493,363.26 |

### COSTS
(through May 1988, plus fee-related costs)

| FIRM | TOTAL |
|---|---|
| Culver Law Firm | 661.08 |
| Mary C. Dunlap | 396.65 |
| Employment Law Center | 263.91 |
| Equal Rights Advocates | 14,758.74 |
| Russell Galloway | 264.38 |
| Richard M. Pearl | 1,242.26 |
| Pearl, McNeill & Gillespie | 12,203.54 |
| SF Lawyers' Committee for Urban Affairs | 39,726.08 |
| Services of Morris J. Baller | 5,400.00 |
| COSTS TOTAL: | $74,916.64 |