Isaac RICHARD, et al., Plaintiffs,

v.

CITY OF PASADENA, et al., Defendants.

No. CV 94–3418 RAP (BQRx).

United States District Court,
C.D. California.

April 13, 1995.

Dan Stormer, Virginia Keeny, and Anne Richardson, Law Offices of Hadsell & Stormer, Pasadena, CA, Mark D. Rosenbaum, ACLU Foundation of S. Cal., Los Angeles, CA, for plaintiffs.

Pierce O'Donnell, Jeffrey S. Gordon and Michael A. Lloyd, Kaye, Scholer, Fierman, Hays & Handler, Los Angeles, CA, for defendants.

## ORDER RE ATTORNEYS' FEES AND COSTS AS MODIFIED BY ORDER OF APRIL 12, 1995

PAEZ, District Judge

## I

### *INTRODUCTION*

On February 27, 1995, the Court heard Plaintiffs' Motion for Attorneys' Fees. Upon full consideration of the moving, opposition, and reply papers, the declarations, exhibits, and oral arguments of counsel, the Court determines that plaintiffs are the prevailing parties in this action and are entitled to an award of their reasonable attorneys' fees and costs in the amount of $74,925.53 against the City of Pasadena,[1] as set forth below.

## II

### *RELEVANT FACTUAL AND PROCEDURAL BACKGROUND*

Isaac Richard took office as a member of the Pasadena City Council in May 1991. Defendants have cited numerous instances in which Councilmember Richard cursed at City employees, threatened them, and the like. On July 14, 1992, Richard apologized at a City Council meeting "specifically to Ms. Mueller and to other staff members [to whom] I acted inappropriately, sworn at or raised my voice. Sometimes I get frustrated which is no excuse." Declaration of Victor Kaleta ("Kaleta Dec."), ¶ 8. Richard himself brought the motion by which the Council repudiated his "abusive language and rude behavior towards City Staff. The Council commits itself to enforce our code of conduct regarding effective, courteous and cooperative working relations with fellow members of the City Council, City staff, members of advisory bodies and the public." *Id.*, ¶ 9.

On July 28, 1992, a motion was first made for the Council to issue a formal censure of Richard, pursuant to Resolution No. 5876. That resolution required Council members to "establish effective, courteous and cooperative working relations with fellow members of the Board, City Staff, members of advisory bodies, and the public." The vote was delayed until August 11, 1992.

The Council circulated its written agenda for that meeting to all members, which included the censure motion. At the meeting on August 11th, Richard did not respond. The Council voted to censure him. No penalties were attached to the censure.

The Pasadena City Council enacted Ordinance No. 6503 on September 11, 1992, which amended section 2.05.120 of the Pasadena Municipal Code. Subsection A of Section 1 of the ordinance stated in relevant part that each council member was required:

2. To perform responsibilities in a manner that is efficient, courteous, responsive and impartial, providing fair and uniform

---

1. Plaintiffs voluntarily dismissed the City Council and individual defendants on July 15, 1994. As the parties refer throughout the papers to "defen-

dants," the Court will do so as well. The judgment, however, is against the City of Pasadena.

treatment of all persons and actions coming before the board of directors.

3. To seek, in making decisions, the overall public good.

5. To establish effective, courteous and cooperative working relations with fellow members of the board, the city staff, members of advisory bodies, and the public.

6. To serve as a communicator between the community and the city, and to facilitate the expression of citizen views.

8. To avoid any action which could be construed by an objective person to create the appearance of:

a. Giving preferential treatment to any person or group.

b. Impeding governmental responsiveness or efficiency.

9. To observe such further rules for the conduct of its proceedings as the board of directors shall adopt by resolution.

Pursuant to subsection B, violations of the standards set forth in subsection A could be enforced by denying a council member "non-Charter or non-statutory benefits which accrue to said member's office" for a period of one year. Upon a second determination that the member had violated a standard, he could lose the benefits for the balance of his term.

Subsection C of Section 1 contained the only "definition" in the ordinance, namely, what was meant by a motion to censure. It further provided in relevant part that a "motion of censure shall not be in order to: 1. Inhibit or punish a member for the courteous expression of his or her opinion upon issues affecting the city or its citizens, or 2. Inhibit or punish a member for his or her courteous expression of points of view not shared by a majority of the board of directors." Ordinance No. 6503 was passed by a vote of four members ("directors"); Richard and two others were absent.

At the time the Council enacted the ordinance, at least some of the members were most concerned about the very content of Richard's speech. For example, in the partial transcript of the meeting of August 11, 1992, when Richard was first censured and Ordinance No. 6503 was first read, several members expressed these concerns. Mayor Cole noted that Richard had accused him of being a racist and a bigot, "perhaps the most offensive thing that someone who grew up in this community and dedicated my life to making this a better city had to endure." Transcript, p. 55. Member Thomson added that he too wanted the Council to act cooperatively, "but, what I find most reprehensible and most unacceptable is the continued accusations that everything that we disagree with him—whether it is because he accosting [sic] a staff member or one of us—it is because there is some racial motivation to it. The comments in today's paper, if they are accurately quoted, are further evidence of that and that is I think the most distasteful thing and a thing that I do not think we can abide." *Id.*, p. 58. Member Paparian stated:

I see the basis for two censure actions 1) for conduct that has occurred prior to today and 2) for statements that have been made regarding the intentions and motivations of all of us here.

*Id.*, pp. 59–60.

After voting to censure Richard, Members Paparian, Hughston and Mayor Cole discussed Paparian's motion that "we agendize at our next meeting the issue of Mr. Richard's accusation that our censure action is the action of a white racist city council." *Id.*, pp. 60–61. Cole expressed his reluctance to begin such a debate, and Paparian asked: "Then how do we put an end to them [the charges of racism]?" Cole said they should ignore them. Paparian responded: "These types of accusations can not be allowed to go unanswered." *Id.*, p. 61. Cole disagreed. Then Hughston said, "I believe Mr. Paparian's Motion gives us a procedural way in which to deal with his behavior." The members voted, and the motion passed. *Id.*, p. 61.

Richard continued making objectionable statements and behaving in a disruptive and abusive, even threatening, manner. Between September 1, 1992 and June 8, 1993, there were approximately nine incidents. On June 8, 1993, the City Council voted to censure Richard, after notifying him in a closed session that the motion would be made. Rich-

ard and his supporters were present when the Council passed the censure motion.

The Mayor confirmed in writing on June 9, 1993 that Richard had been censured for his "intolerable behavior." The Council then amended the censure motion on June 15, 1993 to specify sanctions. Richard had received written notice beforehand and was present at that meeting as well.

On May 25, 1994, Richard and two of his constituents filed this action contesting the constitutionality of Ordinance No. 6503 under the United States and California Constitutions.

On June 6, 1994, the six defendant council members passed a resolution. The preamble stated in relevant part: "Director Richard has now brought legal action asserting, among other things, that the Standards of Conduct underlying his sanctions are unconstitutionally vague and overbroad." The resolution provided in relevant part:

NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Pasadena that it is the sense of the City Council that the original and present purpose of the provisions of Resolution No. 5876[2] and Ordinance No. 6503 (including Section 2.05.120 of the Municipal Code as amended thereby) requiring "effective, courteous and cooperative working relations with fellow members of the Board, the City Staff, members of advisory bodies, and the public," permits sanctions against a Member *only* for that Member's:

(1) *conduct* that substantially disrupts City Council meetings and violates the express rules or customs that are known or should be known to Councilmembers; or

(s) *conduct* that substantially and unreasonably interferes with the ability of any Councilmember, City employee or member of any independent advisory board to perform his or her job or which creates an

objectively intimidating or hostile work environment; . . . .

(Emphasis in original.) Councilman Richard voted against the resolution.

Plaintiff Richard's censure expired by its own terms on June 15, 1994.[3]

In a letter to defendants' counsel dated June 15, 1994, plaintiffs' counsel Mark Rosenbaum stated: "I think the [Resolution], defining ... what it awkwardly says [Ordinance 6503] meant at the time [of its passage], to be revisionist history, dreamy in its aspirations to cure an unconstitutional law."

Plaintiffs filed their First Amended Complaint on June 23, 1994. Like the original complaint, it contained nine causes of action, four of which were federal claims. The First Claim challenged Ordinance No. 6503 as unconstitutionally vague and overbroad on its face. The Second Claim challenged the ordinance on its face and as applied on the grounds that it burdened, penalized, and chilled plaintiffs' rights to free expression and to petition the government for redress of grievances. The amended complaint included an allegation that in adopting the June 6, 1994 resolution, the council members recognized that Ordinance No. 6503 was unconstitutional.

Defendants filed their Answer on July 5, 1994.

On July 15, 1994, plaintiffs voluntarily dismissed the case. The Court retained jurisdiction for the purpose of hearing and determining plaintiffs' attorneys' fees motion.

## III

### *DISCUSSION*

#### A

##### *Standard*

Section 1988 of Title 42 provides for an award of attorneys' fees and costs as follows:

---

2. The Council had adopted Resolution No. 5876 in 1987 to set forth certain "Standards of Conduct for City Councilmembers." It did not contain an enforcement mechanism or a penalty provision.

3. Plaintiffs state that no efforts to censure Richard were initiated after that date, although they note that the Council received at least one complaint. Defendants submitted a declaration and City Council Minutes of the meeting of November 7, 1994, however, showing that Richard was censured again.

In any action or proceeding to enforce a provision of section[ ] ... 1983, ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

A party "prevails" within the meaning of Section 1988 by succeeding on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). The relief need not be a final, formal judgment. As the Supreme Court explained in *Hewitt v. Helms*, 482 U.S. 755, 760–61, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987):

> It is settled law, of course, that relief need not be judicially decreed in order to justify a fee award under § 1988. A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—e.g., a monetary settlement or a change in conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

*See also Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980)— ("Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated."). As originally conceived, § 1988 does not appear to have given defendants the power to block plaintiffs from recovering fees when defendants voluntarily respond to the lawsuit. *See* H.Rep. No. 1558, 94th Cong., 2d Sess. 9, U.S.Code Cong. & Admin.News 1976, p. 2641 ("[A]fter a complaint is filed, a defendant may voluntarily cease the unlawful practice. A court should still award fees even though it might conclude, as a matter of equity, that no formal relief, such as an injunction, is needed.")

The Ninth Circuit has adopted the test set forth in *Nadeau v. Helgemoe*, 581 F.2d 275 (1st Cir.1978) for determining whether a party has prevailed. *California Ass'n of Physically Handicapped v. F.C.C.*, 721 F.2d 667, 671–72 (9th Cir.1983). Under the *Nadeau* test, plaintiff must establish (1) that the lawsuit was a "catalyst" in changing defendant's conduct, and (2) that the underlying constitutional claims were at least colorable. To be a "catalyst," plaintiff must show that it received "some or all of the relief originally sought" as a result of the lawsuit. *Andrew v. Bowen*, 837 F.2d 875, 877 (9th Cir.1988); *see also Wilderness Society v. Babbitt*, 5 F.3d 383 (9th Cir.1993) (lawsuit must have been " 'material factor' or played a 'catalytic role' in bringing about the desired outcome.")

In *Sablan v. Dept. of Finance of N. Mariana Islands*, 856 F.2d 1317, 1325 (9th Cir. 1988), the Ninth Circuit held that to satisfy the first part of the *Nadeau* test, plaintiff had to show its purpose in filing the action and then establish that the lawsuit was causally linked to the relief actually obtained. The court noted that the District Court's view of the chronological sequence of events was a "proper variable" in the causation analysis. *Id.* at 1326. Plaintiff need not, however, receive the identical relief requested in the complaint in order to prevail. *Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 912 (3d Cir.1985). Indeed, "a plaintiff is able to prevail based on relief that the plaintiff may have asserted was inadequate during the course of the litigation." *Id.*

As for the second part of the *Nadeau* test, "the District Court must determine whether there is a legal basis for the plaintiffs' claim—it must not be 'frivolous, unreasonable or groundless.' " *Doty v. County of Lassen*, 37 F.3d 540, 547 (9th Cir.1994) (*quoting Sablan*, 856 F.2d at 1325). Judge Wilson explained: "This test sensibly keeps the District Court from having to address, during the attorney's fees litigation, the merits of resolved disputes to determine whether the relief obtained would have been obtainable by judgment." *Id.* at 548. The Fifth Circuit, at least, has held that this second part of the *Nadeau* test is defendants' burden. Defendants must demonstrate the lack of merit in plaintiff's claims and show "the worthlessness of plaintiff's claims and explain why [defendant] nonetheless voluntarily gave the plaintiffs the requested relief." *Henni-*

gan v. Ouachita Parish School Board, 749 F.2d 1148, 1153 (5th Cir.1983) ("Forcing the defendant to establish that the plaintiff has not presented a cognizable claim is consistent with the Federal Rules of Civil Procedure which allocates this burden to the defendant at every stage of the litigation").

## B

### Analysis

1. Prevailing Party Status

■ Defendants argue that plaintiffs did not "prevail" in the first instance. First, plaintiffs failed to obtain the judgment, consent decree, or settlement that the Supreme Court appears now to require following Farrar v. Hobby, —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). Second, even assuming the catalyst theory is still viable, defendants contend that they never provided plaintiffs with any of the relief they requested and that adoption of the Resolution did not effect a "material change in the legal relationship of the parties[.]"

Plaintiffs respond that Farrar did not eliminate the catalyst theory, as several circuits have held. Moreover, they contend that the June 6 Resolution effectively "nullified" Ordinance No. 6503.

In Farrar, the coadministrators of Farrar's estate challenged the allegedly illegal closure of the Liberty County school that Farrar and his son owned and operated for delinquent, disabled, and disturbed teens following the death of one of the students. Although the jury found a deprivation of civil rights, it did not award plaintiffs any relief. The Fifth Circuit subsequently "remanded for entry of judgment against Hobby for nominal damages." Id.

The Supreme Court addressed only the narrow question of "whether a civil rights plaintiff who receives a nominal damages award is a 'prevailing party' eligible to receive attorney's fees under 42 U.S.C. § 1988." —— U.S. at ——, 113 S.Ct. at 570. The Court held that such a plaintiff was a prevailing party under § 1988. Id. at ——,

113 S.Ct. at 573. In reaching this point, the Court reviewed the requirements for achieving prevailing party status and stated:

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, Hewitt, supra, 482 U.S., at 760, 107 S.Ct., at 2675, or comparable relief through a consent decree or settlement, Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. See Hewitt, supra, 482 U.S., at 764, 107 S.Ct., at 2677. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." Rhodes [v. Stewart], 488 U.S., [1] at 4, 109 S.Ct., [202] at 203 [102 L.E.2d 1]. Only under these circumstances can civil rights litigation effect "the material alteration of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party. Garland, supra, 489 U.S., at 792–793, 109 S.Ct., at 1493. In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

Id. The Farrar case prompted some disagreement in the circuits. For example, the Fourth Circuit determined that Farrar had eliminated the "catalyst theory." See S–1 And S–2 v. State Board of Education, 21 F.3d 49 (4th Cir.1994).

Several other circuits, however, have distinguished Farrar and held that the catalyst rule survives. Specifically, the First, Third, Fifth, Eighth, and Tenth Circuits "all hold that the catalyst test survives Farrar." Southeastern Fisheries Ass'n v. Chiles, 876 F.Supp. 270, 271 (S.D.Fla.1995) (citations omitted).[4]

In distinguishing Farrar, courts have stressed two key points. One—Farrar expressly concerned only the question of

---

4. In the Ninth Circuit, at least one panel has simply assumed that the catalyst theory applies.

See Doty v. County of Lassen, supra, 37 F.3d at 547–48.

whether one might prevail under § 1988 with a nominal damages *award*. The catalyst theory or rule was established for those cases in which plaintiffs had not obtained an award, settlement, or consent decree. Consequently, "any language implicating the 'catalyst theory' was dictum." *Baumgartner v. Harrisburg Housing Authority*, 21 F.3d 541, 547 (3d Cir.1994).

The circuits have also declined to declare the catalyst rule dead following *Farrar* because Justice Thomas never even mentioned it in the opinion. As the Seventh Circuit explained: "We simply find it implausible that the Supreme Court meant to abolish a rule employed by nearly every circuit and previously recognized by the Court itself as 'settled law,' without expressly indicating that it was doing so." *Zinn v. Shalala*, 35 F.3d 273, 276 (7th Cir.1994). Such an interpretation, the Third Circuit noted, would conflict with the Supreme Court's emphasis on ends over means in determining "whether a plaintiff has prevailed and [ ] the appropriate amount of fees." *Baumgartner*, 21 F.3d at 547–48. Moreover, there would be no benefit in requiring plaintiffs to prolong litigation after "already effectively achiev[ing] their goals," simply to qualify as the prevailing party. "Indeed, requiring plaintiffs to proceed with the litigation notwithstanding defendants' accession to plaintiffs' position would be inconsistent with plaintiffs' obligations under Rule 11." *Id.* at 548. The Third Circuit also observed:

> [F]rom a policy standpoint, if defendants could deprive plaintiffs of attorney's fees by unilaterally mooting the underlying case by conceding to plaintiffs' demands, attorneys might be more hesitant about bringing these civil rights suits, a result

inconsistent with Congress' intent in enacting section 1988.

*Id.*[5] For all these reasons, the Court concludes that *Farrar* did not eliminate the catalyst rule.

As for plaintiffs' role as the "catalyst" in Pasadena's adoption of the June 6 Resolution, defendants offered no evidence that they had any intention of narrowing Ordinance No. 6503 by resolution or otherwise *until* plaintiffs initiated this action.[6] The preamble to the resolution makes this clear.

Defendants' contention that plaintiffs received none of the relief they sought as a result of the resolution is similarly unavailing. Plaintiffs unequivocally challenged the vagueness and overbreadth of Ordinance No. 6503 and sought declaratory and injunctive relief to invalidate it and prevent its enforcement. The resolution completely eliminated the possibility of using the ordinance to censure speech, thus assuring that any future efforts to censure Richard (or anyone else) would have to be based strictly on prohibited conduct. The fact that plaintiffs recognized that the June 6 resolution effectively resolved the key issue of their case does not mean that they somehow failed in their efforts to cure a constitutionally defective ordinance, as defendants seem to argue. Rather, the chronology of events and defendants' own statements in the resolution's preamble demonstrate the "cause and effect" that enables plaintiffs to claim success—defendants acquiesced, and quickly at that. Plaintiffs unquestionably prevailed in obtaining an important part of the relief they sought.

### 2. *Legal Basis for the Claim(s)*

Defendants contend that plaintiffs failed "to show that their constitution-

---

**5.** The same point holds true with respect to settlements. That is, if defendants can insulate themselves from liability for attorney's fees simply by responding voluntarily to plaintiffs' lawsuit, no defendant would enter a settlement agreement or consent decree.

**6.** Defendants argued at the hearing on plaintiffs' motion that *White v. City of Norwalk*, 900 F.2d 1421 (9th Cir.1990), provided authority for their view that the City's construction of the ordinance, regardless of when made, was entitled to deference. In *White*, the City relied on addition-

al language within the existing ordinance to support its narrow construction. Here, nothing in Ordinance No. 6503 supported the "conduct only" construction that defendants claim they always intended. Defendants recognized, albeit belatedly, that the ordinance itself was not susceptible to a narrowing construction and would require amendment or other clarification. The fact that this affirmative act was necessary, combined with the fact that defendants did not act until sued, distinguishes the instant case from the circumstances in *White*.

claims in the underlying case were meritorious." They argue that council meetings and offices are limited public forums, and that the Ordinance was and is constitutional "as interpreted by the city and as applied to Richard's conduct."

Defendants correctly note that courts have upheld certain restrictions on speech in the limited public forum of a city council meeting. The case on which defendants rely most heavily, however, does not support a finding that Ordinance No. 6503 would withstand plaintiffs' constitutional challenge without the June 6 Resolution. The Ninth Circuit recognized in *White v. City of Norwalk, supra,* that the structured setting of a city council meeting allows a council to keep to its agenda by curtailing repetitive or disruptive speech. The Norwalk ordinance included language that the court determined subjected speakers to "restriction only when their speech 'disrupts, disturbs or otherwise impedes the orderly conduct of the Council meeting.'" 900 F.2d at 1426. Ordinance No. 6503 was not so limited, and the fact that the speech restrictions here applied at least in part to expressions in the limited public forum of a council meeting does not mean that the ordinance may evade scrutiny.

Plaintiffs correctly observe that defendants did not even attempt to defend Ordinance No. 6503 on its face. Moreover, the June 6 Resolution shows that defendants acknowledged that Ordinance No. 6503 could not withstand a facial challenge. And to the extent defendants contend that the June 6 Resolution simply clarified Pasadena's actual practice all along in construing Ordinance No. 6503, plaintiffs demonstrate that suppression of certain speech was indeed a motivating factor in the ordinance's passage. Most importantly, though, plaintiffs demonstrate that they had, at the very least, a colorable claim that Ordinance No. 6503 was both vague and overbroad on its face.

Judge Tashima recently reviewed the concerns that led to the "vagueness doctrine":

In the area of expressive conduct, vague laws offend several important values: (1) they may trap the innocent by failure to provide fair warning; (2) they may fail to provide explicit and objective standards and therefore permit arbitrary and discriminatory enforcement; and (3) they may inhibit First Amendment freedoms by forcing individuals to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked."

*Finley v. National Endowment For the Arts,* 795 F.Supp. 1457, 1471 (C.D.Cal.1992) (citations omitted). A statute must be defined clearly enough "so as not to cause persons 'of common intelligence—necessarily [to] guess at its meaning and [to] differ as to its application.'" *Id., quoting Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). As the Supreme Court stated more recently, "[t]he question is not whether discriminatory enforcement occurred here ... but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1051, 111 S.Ct. 2720, 2732, 115 L.Ed.2d 888 (1991).

Plaintiffs identified numerous reasons why Ordinance No. 6503 is unconstitutionally vague. First, no term or phrase contained in the ordinance is even defined in the law itself or elsewhere (with the exception of "motion to censure"). Words like "courteous," "responsive," and "impartial" are thus open to limitless varieties of interpretation. Second, "[t]he standards set forth in the ordinance were entirely subjective in their construction, and plainly lent themselves to interpretations restrictive of speech." For example, in protecting only "courteous" expression of opinions or minority points of view, the Ordinance necessarily required members to make content-based distinctions regarding an offending member's speech according to their personal values.

In addition, plaintiffs contend that the various responsibilities listed in subsection A of the Ordinance readily encompass expression, for example, "perform[ing] responsibilities in a manner that is efficient, courteous, responsive and impartial," "seek[ing], in making decisions, the overall public good[,]" and "serv[ing] as a communicator between the community and the city." The lack of definitions combined with the implicit acknowledgement in subsection C that *discourteous*

speech most certainly was intended to be suppressed by the Ordinance, renders the Ordinance unconstitutionally vague because it "subjects the exercise of the right . . . to an unascertainable standard[.]" *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (ordinance prohibiting individuals from assembling "in a manner annoying to persons passing by" was vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.") Plaintiffs' challenge of Ordinance No. 6503 on vagueness grounds was "not frivolous, unreasonable or groundless." *Doty,* 37 F.3d at 548.

Plaintiffs also attacked Ordinance No. 6503 as overbroad. The test is " 'whether the enactment reaches a substantial amount of constitutionally protected conduct.' " *City of Houston, Texas v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987), *quoting Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *Kolender v. Lawson,* 461 U.S. 352, 359, n. 8, 103 S.Ct. 1855, 1859, n. 8, 75 L.Ed.2d 903 (1983). Plaintiffs argue persuasively that the ordinance's lack of definitions and use of judgment-laden terms directly threatens political speech. "Courteous" expression is very much a matter of personal opinion. And it takes little imagination to foresee that in a political setting, opinions that one disagrees with can readily become "discourteous expression" the moment they are uttered. Plaintiffs' quotation of Justice Harlan in *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) is on point:

> Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another man's lyric.

Plaintiffs thus stated a colorable claim that Ordinance No. 6503 was unconstitutionally overbroad.

Defendants implicitly acknowledged that Ordinance No. 6503 is facially vague and/or overbroad. As noted above, they contend that the City's interpretation of the ordinance in Resolution No. 7127, in effect, "saves" the ordinance. Even if this were true, this argument necessarily concedes that plaintiffs' challenge to Ordinance No. 6503 was well-taken in the first instance. Moreover, for purposes of determining whether plaintiffs prevailed and to what extent, defendants' emphasis on the salutary effect of Resolution No. 7127 glosses over the crucial point that there is absolutely no evidence that defendants would have adopted the resolution but for plaintiffs' lawsuit. Indeed, defendants cannot argue that the Council had ever "interpreted" Ordinance No. 6503 before the lawsuit. This is not to say that a post-lawsuit interpretation is automatically suspect, but rather that the issue of whether the ordinance is susceptible to a saving revision or interpretation is a separate question from that of whether such revision or interpretation had occurred before the lawsuit so as to render the challenge invalid. At the time plaintiffs sued, the ordinance was vague and overbroad. Nothing in the ordinance limited its application to conduct alone. No interpretation so limited its application. It took a wholly separate resolution to rescue it, and under these circumstances, plaintiffs' claims were far from groundless.

Defendants also argue that the Resolution, adopted in 1994 at least partly in response to the lawsuit, should be considered evidence of the Council's original intent in passing the ordinance in *1992.* Defendants contend that "[b]y thus stating both the 'original and present purpose' of the Ordinance, the Council made clear that Ordinance 6503 was *always* interpreted to be consistent with the First Amendment and Fourteenth Amendment guarantees protecting speech." Defendants overreach, however. Defendants stated in the preamble to the Resolution that "Director Richard has now brought legal action asserting, among other things, that the Stan-

dards of Conduct underlying his sanctions are unconstitutionally vague and over-broad[.]" The Council's statement that their construction of the ordinance as set forth in the June 6 Resolution actually reflected their purpose all along, absent contemporaneous corroborative evidence, fails to provide support for their position.

Defendants contend that the Court must evaluate the ordinance's constitutionality "only on its meaning as authoritatively construed" by the June 6 Resolution. But, as discussed above, no such "authoritative[ ] constru[ction]" even existed when plaintiffs initiated this action. This argument misses the entire point of plaintiffs' lawsuit which was to ensure that the ordinance would be "authoritatively construed" so as not to apply to speech. The fact is that not until plaintiffs sued did defendants "authoritatively construe[ ]" the ordinance to cover only conduct. It may well be that had this case gone forward, the Court might have found that the June 6 Resolution clarified the ordinance sufficiently so that it *no longer* violated the First Amendment. It simply does not follow that plaintiffs' initial claims lacked merit because defendants voluntarily responded by eliminating the defects. This argument is therefore rejected.

### 3. *Reasonableness of the Fee Request*

The Ninth Circuit has held that "[t]he touchstone in determining whether hours have been properly claimed is reasonableness." *Davis v. City and County of San Francisco,* 976 F.2d 1536, 1543 (9th Cir. 1992). The court added that the "assessment of reasonableness is made by reference to standards established in dealings between paying clients and the private bar." Moreover, " 'all reasonable time spent is to be compensated.' " *Id.* (citation omitted).

It is the fee applicant's burden to "prove by a preponderance of the evidence that the hours expended on the litigation were reasonable. They must submit detailed time records." *U.S. v. City and County of San Francisco,* 748 F.Supp. 1416, 1419 (N.D.Cal. 1990), *citing Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210 (9th Cir.1986), *reh'g*

*denied, opinion amended,* 808 F.2d 1373 (9th Cir.1987).

■ As for time spent preparing fee petitions, there is no question that the prevailing party is entitled to compensation. *Davis,* 976 F.2d at 1544 (citations omitted). Time spent in press conferences, moreover, is also compensable. The Ninth Circuit has held that "[w]here the giving of press conferences and performance of other lobbying and public relations work is directly and intimately related to the successful representation of a client, private attorneys do such work and bill their clients." As a result, "[p]revailing civil rights plaintiffs may do the same." *Id.* at 1545.

■ In this case, plaintiffs are entitled to recover fully for their attorneys' fees up to and including June 6, 1994, when the City adopted the resolution that plaintiffs contend was the result this litigation achieved. Plaintiffs are also entitled to compensation for attorney time after June 6th spent conferring with their clients and opposing counsel regarding settlement and dismissal of the action. Finally, plaintiffs are entitled to their attorneys' fees in connection with this fee request. The Court has excluded from these categories Mr. Rosenbaum's and Ms. Keeny's time spent preparing the supplemental declarations, the hours Mr. Rosenbaum spent on research and drafting the attorneys' fees motion (because there was no showing that these efforts did not duplicate his research and drafting time prior to June 6, 1994), time spent on non-attorneys' fees discovery, hours recorded for preparing and serving the amended complaint, and time labelled "miscellaneous." In addition, the lack of specificity in Mr. Rosenbaum's time records, which was not adequately cured by his deposition or supplemental declarations, warrants a further reduction of his adjusted hours by fifteen percent.

Defendants did not challenge the hourly rates that plaintiffs' counsel requested. Accordingly, the Court determines that the following adjusted hours are reasonable and that the total amount is appropriate and reasonable, as follows:

| Name | Rate | Pre-6/6 | Post-6/6 | Fees | Total |
|------|------|---------|----------|------|-------|
| MDR [7] | $325 | 81.43 | 6.12 | 52.45 | $45,500.00 |
| DS [8] | $325 | 11.3 | 2.9 | -- | $ 4,615.00 |
| VK [9] | $180 | 56 | 6.3 | 59.1 | $21,852.00 |
| AR [10] | $170 | -- | 3.6 | 3.2 | $ 1,156.00 |
| KH [11] | $ 80 | 1.9 | -- | 8.6 | $ 840.00 |
| | | | | TOTAL | $73,963.00 |

Costs

| | | |
|---|---|---|
| 5/12-7/15 | | $ 710.15 |
| 8/02-8/31 | | $ 246.38 |
| 9/12 | | $ 6.00 |
| | TOTAL | $ 962.53 |
| | TOTAL FEES & COSTS | $74,925.53 |

## IV

### CONCLUSION

For the reasons set forth above, the Court hereby finds that plaintiffs are the prevailing parties in this action and are entitled to recover their reasonable attorneys' fees and costs, set forth above, in the amount of $74,-925.53. The foregoing shall constitute the findings of fact and conclusions of law required under Fed.R.Civ.P. 54(d)(2)(C).

**IT IS SO ORDERED.**

7. Mark D. Rosenbaum.

8. Dan Stormer.

9. Virginia Keeny.

10. Anne Richardson.

11. Kristine Hadsell.